SUPREME COURT.   Albany General Term, June, 1855.  *Parker,*
*Wright* and *Harris,* Justices.

## THE PEOPLE *vs.* HENRIETTA ROBINSON.

Voluntary drunkenness is not a legal excuse for the commission of crime.

The rule is otherwise where the drunkenness is not voluntary.

In the cases of *delirium tremens* or *mania a potu,* the insanity excuses the act,
the frenzy being, not the immediate, but a remote consequence of indulgence
in strong drink.

But where the nature and essence of the crime are made by law to depend
upon the peculiar state and condition of the criminal's mind, at the time,
and with reference to the act done, drunkenness may be a proper subject
for the consideration of the jury, not to excuse or mitigate the offence, but
to show that it was not committed.   Per PARKER, J.

A person stimulated even to the highest pitch of frenzy by voluntary indul-
gence in strong drink, may still be capable of planning and executing a
criminal design ; and where in such case there is mind enough to conceive
and perpetrate the act, there is enough to subject the offender to legal
responsibility.

A case can not be brought within the first subdivision of the statute defining
murder, (2 *R. S.* 657, § 5,) unless there be a premeditated design, *in fact,*
to effect the death of the person killed, or of some other human being.  Per
PARKER, J.

Where, on trial of an indictment for murder by poisoning, the judge charged
the jury " that if the prisoner was intoxicated to such an extent that she
was unconscious of what she was doing, still the law holds her responsible
for the act," but it appeared from other parts of the charge, that the judge
intended to speak and that the jury must have understood him as speaking
only with reference to a state of mental excitement or madness, the imme-
diate consequence of indulgence in strong drink, and not of a state of in-
sensibility, *held,* that the charge was not erroneous.

*Held,* also, that even though the expression excepted to could not be regarded as
modified and explained by other parts of the charge, and might be consid-
ered erroneous as an abstract and separate proposition, yet that it furnished
no ground for granting a new trial, it appearing plainly that it had no ap-
plicability to the case, there being no fact or circumstance to warrant an
inference, that the accused was at the time of the commission of the act, in
a state of unconsciousness or insensibility from intoxication.

After verdict, it is too late to object for the first time that no precept was
issued by the district attorney to the sheriff requiring him, among other
things, to summon a grand jury, under 2 *R. S.* 206, § 37, it appearing that
the grand jury was regularly drawn and summoned according to the re-
quirements of the statute.

Form of an indictment for murder by poisoning, with counts at common law
and under the statute.

The People *v.* Robinson.

Where a person, charged to have been murdered by poison, expressed during his last illness, his opinion that he should not live, but was encouraged by his attending physician to believe that he would recover, his statements made immediately thereafter were held not to be admissible evidence as dying declarations. Per HARRIS, J.

Very soon after the drinking of the supposed poison, the deceased was asked how he felt "after that glass of beer," *held*, that his answer "that he did not feel comfortable," was competent evidence, though made in the absence of the prisoner. Per HARRIS, J.

Where, it appeared that a third person had drank with the deceased at the same time he was supposed to have been poisoned, of the same beverage and administered by the same person, and had died soon afterwards, the court permitted evidence to be given that arsenic was found in the stomach of such person, and that she died from the effects of that poison. Per HARRIS, J.

Symptoms of poisoning by arsenic described by physicians, with their opinions on the subject of insanity, set forth in the evidence.

This was a *certiorari* to the Rensselaer Oyer and Terminer, in which court the prisoner had been convicted before Harris Justice and the Justices of the Sessions, in May, 1854, of the murder of Timothy Lanagan, by poisoning. The indictment was as follows:

At a court of Oyer and Terminer held at the Court House in the city of Troy, in and for the county of Rensselaer, on the third Monday of February, in the year of our Lord one thousand eight hundred and fifty-four, before the Honorable Malbone Watson, one of the justices of the Supreme Court of the state of New York, together with Nathan T. Burdick and Thomas Newbury, Esquires, the two justices of the peace of said county designated, according to the statute in such case made and provided, as members of the Court of Sessions, duly authorized and empowered by virtue of their respective offices, and by the act in such case made and provided, at the time and place aforesaid, to inquire by the oath of good and lawful men of the said city and county, and by other ways and means, by whom and by which the truth of the matter might be better known, of whatsoever treasons, felonies, trespasses or other crimes and misdemeanors, or the accessaries to them in the said city and county, by whom, and in what manner soever done or com-

mitted, and of every circumstance concerning the same, and the said treason, felonies, trespasses and other crimes and misdemeanors to hear and determine..

*County of Rensselaer, ss:*

The jurors for the people of the state of New York, in and for the body of the county of Rensselaer, to wit: Martinus Lansing, Daniel A. Rhodes, James H. Eldridge, William P. Button, Edward A. Billings, Ezra Mambert, John F. Barringer, Hezekiah Coon, Thomas Stickney, William F. Hunt, Sandford A. Tracy, John B. Ford, John L. Wager, John Whitford, John M. Fonda, John Aiken, William C. Raymer, John L. Defreest and Israel Howe, then and there being duly sworn and charged, upon their oath present, that Henrietta Robinson, late of the city of Troy, and in the county of Rensselaer aforesaid, not having the fear of God before her eyes, but being moved and seduced by the instigation of the devil, and of her malice aforethought, wickedly contriving and intending one Timothy Lanagan with poison willfully, feloniously and of her malice aforethought to kill and murder heretofore, to wit: on the twenty-fifth day of May, one thousand eight hundred and fifty-three, with force and arms, at the city of Troy, in the county of Rensselaer aforesaid, knowingly, willfully, feloniously and of her malice aforethought, a large quantity of a certain deadly poison, called white arsenic, to wit: the quantity of two drachms of the said white arsenic, did put, mix and mingle into and with a certain quantity of beer, then and there being, to wit: one half pint of beer, and that the said Henrietta Robinson, then and there knowingly, willfully, feloniously and of her malice aforethought, did solicit, ask, persuade and instigate the said Timothy Lanagan, to drink and swallow down the said beer so mixed and mingled with the said deadly poison as aforesaid, and that he the said Timothy Danagan, by the said solicitation, asking, persuasion and instigation of the said Henrietta Robinson, as aforesaid, the said beer so mixed and mingled with the said deadly poison as aforesaid (he the said Timothy Lanagan not knowing the said beer to be so poison-

ed), did then and there, take, drink and swallow down, by means whereof he the said Timothy Lanagan then and there became sick and greatly distempered in his body; and the said Timothy Lanagan, of the poison aforesaid so by him taken, drank and swallowed down as aforesaid, and of the sickness occasioned thereby, on the said twenty-fifth day of May, in the year last aforesaid at the city of Troy aforesaid, in the county aforesaid, did languish, and languishing did live; on which said twenty-fifth day of May in the year aforesaid, the said Timothy Lanagan, at the city of Troy aforesaid, in the county aforesaid of the said poison and of the sickness occasioned thereby, died. And so the jurors aforesaid upon their oath aforesaid, do say, that the said Henrietta Robinson, the said Timothy Lanagan, in the manner and by the means aforesaid, knowingly, willfully, feloniously and of her malice aforethought, did kill and murder, against the form of the statute in such case made and provided, and against the peace of the people of the state of New York and their dignity.

And the jurors aforesaid, upon their oath aforesaid, do further present that the said Henrietta Robinson, not having the fear of God before her eyes, but being moved and seduced by the instigation of the devil, and of her malice aforethought, wickedly contriving and intending the said Timothy Lanagan with poison, knowingly, willfully, feloniously and of her malice aforethought to kill and murder, on the twenty-fifth day of May, one thousand eight hundred and fifty-three, with force and arms, at the city of Troy in the county of Rensselaer aforesaid, knowingly, feloniously. willfully and of her malice aforethought, a large quantity of a certain deadly poison called arsenic, to wit: two drachms of the said arsenic, did put, mix and mingle into and with a certain quantity of beer which the said Timothy Lanagan was then and there about to drink, (the said Henrietta Robinson then and there well knowing that he the said Timothy Lanagan, intended and was then and there about to drink the said beer, and the said Henrietta Robinson, then and there also well knowing the said arsenic so as aforesaid by her put, mixed and mingled into and with the said beer, to be

a deadly poison,) and that the said Timothy Lanagan after-
wards, to wit, on the day and year last aforesaid, at the city of
Troy aforesaid, and in the county of Rensselaer aforesaid, did
take, drink and swallow down a large quantity, to wit, half a
pint of the said beer with which the said arsenic was so mixed
and mingled by the said Henrietta Robinson as aforesaid, (he
the said Timothy Lanagan, at the time he so took, drank and
swallowed the said beer, not knowing there was any arsenic or
any other poisonous or hurtful ingredient mixed or mingled with
the said beer,) by means whereof he, the said Timothy Lanagan,
then and there became mortally sick and distempered in his
body; and the said Timothy Lanagan, of the poison aforesaid
so by him taken, drank and swallowed down as aforesaid, and
of the said mortal sickness occasioned thereby, on the said
twenty-fifth day of May, in the year aforesaid, at the city afore-
said, in the county aforesaid, did languish, and languishing did
live; on which said twenty-fifth day of May, in the year afore-
said, at the city aforesaid, in the county aforesaid, the said
Timothy Lanagan, of the poison aforesaid, so by him taken,
drank and swallowed down, and of the mortal sickness occa-
sioned thereby as aforesaid, did die. And so the jurors afore-
said upon their oaths aforesaid, do say that the said Henrietta
Robinson, him the said Timothy Lanagan, in the manner and
by the means aforesaid, knowingly, willfully, feloniously and
of her malice aforethought, did kill and murder, against the
form of the statute in such case made and provided, and against
the peace of the people of the state of New York and their
dignity.

And the jurors aforesaid, upon their oath aforesaid, do further
present that the said Henrietta Robinson, not having the fear
of God before her eyes, but being moved and seduced by the
instigation of the devil, and of her malice aforethought, wick-
edly contriving and intending one Timothy Lanagan with
poison, willfully, feloniously and of her malice aforethought,
to kill and murder, heretofore to wit: on the twenty-fifth day
of May, one thousand eight hundred and fifty-three, with force

and arms, at the city of Troy, in the county of Rensselaer aforesaid, knowingly, willfully, feloniously and of her malice aforethought, and with a premeditated design to effect the death of the said Timothy Lanagan, in the peace of God and of the people of the state of New York then and there being, a large quantity of a certain deadly poison called white arsenic, to wit: the quantity of two drachms of the said white arsenic, did put, mix and mingle into and with a certain quantity of beer then and there being, to wit, one half pint of beer, and that the said Henrietta Robinson then and there knowingly, willfully, feloniously and of her malice aforethought, and with a premeditated design to effect the death of the said Timothy Lanagan, did solicit, ask, persuade and instigate the said Timothy Lanagan, to drink and swallow down the said beer; so mixed and mingled with the said deadly poison as aforesaid, and that he, the said Timothy Lanagan, by the said solicitation, asking, persuasion and instigation of the said Henrietta Robinson as aforesaid, the said beer so mixed and mingled with the said deadly poison as aforesaid (he the said Timothy Lanagan, not knowing the same to be deadly poison,) did then and there take, drink and swallow down, by means whereof he the said Timothy Lanagan, then and there became sick and greatly distempered in his body; and the said Timothy Lanagan, of the poison aforesaid, so by him taken, drank and swallowed down as aforesaid, and of the sickness occasioned thereby, on the said twenty-fifth day of May, in the year last aforesaid, at the city of Troy aforesaid, in the county aforesaid, did languish, and languishing did live; on which said twenty-fifth day of May, in the year aforesaid, the said Timothy Lanagan, at the city of Troy aforesaid, in the county aforesaid, of the said poison and of the sickness occasioned thereby, died.

And so the jurors aforesaid upon their oath aforesaid, do say that the said Henrietta Robinson, the said Timothy Lanagan, in the manner and by the means aforesaid, knowingly, willfully, feloniously and of her malice aforethought, and with a premeditated design to effect the death of the said Timothy Lana-

gan, did kill and murder, against the form of the statute in such case made and provided, and against the peace of the people of the state of New York and their dignity:

And the jurors aforesaid, upon their oath aforesaid, do further present that the said Henrietta Robinson, not having the fear of God before her eyes, but being moved and seduced by the instigation of the devil and of her malice aforethought, wickedly contriving and intending the said Timothy Lanagan with poison, knowingly, willfully, feloniously and of her malice aforethought to kill and murder, and with a premeditated design to effect the death of the said Timothy Lanagan, on the twenty-fifth day of May, one thousand eight hundred and fifty-three, with force and arms, at the city of Troy in the county of Rensselaer, aforesaid, knowingly, willfully, feloniously and of her malice aforethought and with a premeditated design to effect the death of the said Timothy Lanagan, a large quantity of a certain deadly poison called arsenic, to wit: two drachms of the said arsenic, did put, mix and mingle into and with a certain quantity of beer which the said Timothy Lanagan was then and there about to drink, (the said Henrietta Robinson then and there well knowing that he the said Timothy Lanagan intended, and was then and there about to drink the said beer, and the said Henrietta Robinson then and there also well knowing the said arsenic so as aforesaid by her put, mixed and mingled into and with the said beer, to be a deadly poison;) and that the said Timothy Lanagan afterwards, to wit, on the day and year last aforesaid, at the city of Troy aforesaid, and in the county of Rensselaer aforesaid, did take, drink and swallow down a large quantity, to wit, half a pint of the said beer, with which the said arsenic was so mixed and mingled by the said Henrietta Robinson as aforesaid, (he the said Timothy Lanagan, at the time he so took, drank and swallowed down the said beer, not knowing there was any arsenic, or any other poisonous or hurtful ingredient mixed or mingled with the said beer,) by means whereof he the said Timothy Lanagan then and there became mortally sick and distempered

in his body; and the said Timothy Lanagan of the poison. aforesaid, so by him taken, drank and swallowed down as aforesaid, and of the said mortal sickness occasioned thereby, on the said twenty-fifth day of May in the year aforesaid, at the city aforesaid, in the county aforesaid, did languish, and languishing did live; on which said twenty-fifth day of May, in the year aforesaid, at the city aforesaid, in the county aforesaid, the said Timothy Lanagan, of the poison aforesaid so by him taken, drank and swallowed down, and of the mortal sickness occasioned thereby as aforesaid, did die.

And so the jurors aforesaid, upon their oath aforesaid, do say that the said Henrietta Robinson, him the said Timothy Lanagan in the manner and by the means aforesaid, knowingly, willfully, feloniously and of her malice aforethought, and with a premeditated design to effect the death of the said Timothy Lanagan, did kill and murder, against the form of the statute in such case made and provided and against the peace of the people of the state of New York and their dignity.

There were other counts in the indictment. The prisoner pleaded not guilty. On the trial *Anson Bingham,* (District Attorney,) and *G. Van Santvoord* and *Henry Hogeboom,* appeared as counsel for the people, and *William A. Beaeh, Abm. B. Olin, Martin I. Townsend* and *Job Pierson,* for the prisoner.

On the trial *Doct Henry Adams* was called as a witness for the prosecution and testified as follows: I reside in Troy, and am a practicing physician; have been for several years; knew Timothy Lanagan in his lifetime, and was his family physician previous to his death; he died in·May, 1853; I saw him on the day of his death; was called to see him on the afternoon of that day; went to his house; remained there until he died; he died about half-past six or seven o'clock the same day; Dr. Skilton was there with me; he came there after I did, and continued there until the man died; Mr. Lanagan lived in the north or upper part of the city, corner of River and Rensselaer streets, south-east corner; that was the place where he died; the dwelling where he lived was a small one story building, not painted at that time, I think; there were two rooms; the

front room was used as a grocery store; this grocery fronted on River street; the other room was in the rear of the grocery, and was used for family purposes; he died in the back room; there was a bed in that room; I know the prisoner Mrs. Robinson, if it is she.

*Mr. Hogeboom.*—Is it not proper, your Honor, that the prisoner should remove her veil a little while, that she may be identified?

The Court.—There is no objection to that, is there?

The prisoner removed her veil, and witness said: That is the lady; I knew her some two months previous to Lanagan's death; she lived on the opposite side of the street, a little north; the house south of hers, and adjoining, is Mr. Boutwell's [a diagram was here shown witness of the location of the dwellings and streets in the neighborhood of which he was speaking; he said it was correct, and he pointed out the houses occupied by Lanagan, Mrs. Robinson, and Mr. Boutwell.] When I first arrived at the house, I found Mr. Lanagan in bed in the back room; when I first saw him he was vomiting profusely; I supposed from the symptoms that he had been taking some poison; this supposition was first induced by the statement of the family that poison had been administered to him; the symptoms indicating poison were intense pain in the stomach and bowels; burning sensation in the throat; vomiting was an indication of it; there were several evacuations of the bowels; these symptoms continued until his death; I do not know what he died of; suppose he died of the effects of some poisonous substance administered; this is my impression; this is my belief; it is a decided belief; I could not exactly tell from the nature of the symptoms what the poisonous substance was; the symptoms would correspond with the effects of arsenic; besides myself and Dr. Skilton in the room with Lanagan, were the family and friends of the deceased; no other physicians were present; I was not present at any *post mortem* examination; after arriving at the residence of Mr. Lanagan's, I found his symptoms were very violent, and I was apprehensive that the case would terminate fatally; Mr. Lanagan told me that he

thought he should not recover; he did not ask me what I thought; after seeing him I had no expectation of his recovery; I do not remember that he stated more than once that he thought he would not recover; his expression was this: " the villain has destroyed me, and I shall not recover."

*Cross-examination by Mr. Beach.*—At what stage of your visit did he make this statement?

Witness: It was perhaps half an hour after I first saw him.

Q. Did you give him any encouragement that he would recover?

A. I told him he ought not to despair; that he might recover; I was then adopting remedies to alleviate his pain; the remedies did not relieve him, as I could perceive; I am not able to tell whether they did relieve him or not; the symptoms continued much the same way; I can't say from knowledge that the pain continued as acute after the medicine was given him as before; there were intervals when he had less pain; he continued afterwards to take my medicine and I continued to labor for his recovery; his decease was sudden; he lingered from two and a half to three hours after he told me he thought he should not recover; the conversation between deceased and myself occurred very soon after I went; up to within a few minutes of his death he continued to converse; half an hour, certainly; he continued to help himself in and out of bed up to about half an hour previous to his death; I do not recollect that a minister was sent for; his mother knelt down by the bed and prayed; this was perhaps half an hour previous to his death; we had concluded at this time that he would not recover; I did not express the apprehension; there was a great deal of confusion among the friends and family at this time; myself and associate, previous to this time, perhaps an hour or an hour and a half, had definitely concluded that he could not recover; I understand Lanagan to have been an Irishman.

*Direct examination resumed.*—When I say " we concluded," I mean Dr. Skilton and myself, upon consultation between us, we expressed that opinion to each other; I formed an opinion when I first saw him that he would not recover; and I con-

tinued of that opinion throughout; it was a case of violent symptoms; an aggravated case; there were occasionally appearances of less pain than at others; such is the case in all pain produced by poison; it was after the remark that he made that " the villain had destroyed him," that I told him he ought not to despair; I do not think that during the time I was there he expressed any hope or expectation of recovery; when I told him that he might recover, I did not believe he would; I do not recollect that he spoke on the subject whether he would recover or not, but once; I do not remember that the remark he made about " the villain had destroyed him," was made more than once; do not recollect that he said any thing about being " done for;" I think " the villain has destroyed me," is the precise expression used by the deceased; I had conversation with him in regard to the origin of his ailment; the conversation was before he stated to me his belief that he would not recover; I do not remember distinctly whether he spoke of the origin of his ailment after he told me he thought he should not recover; he was lying on the bed when I first came in; I think he was vomiting when I first came in; I did not ask him what was the matter with him; my medicines apparently produced no effects upon him; the family were conversing about the matter when I came in, and I heard the story as to his ailment part from him and part from the family.

*Mr. Hogeboom* to the Court: I propose now, your Honor, to ask him from what source he derived this poison; by whom it was administered, and under what circumstances. I suppose it is advisable to put the questions, on the ground that here was a party about to die; the circumstances were of recent occurrence. What he then said, was a dying declaration, and therefore he had no motive to misrepresent the truth. The impression produced on the mind of the physician by the symptoms was that the deceased would not recover, and such was the belief of the deceased. The question was as to the admissibility of this testimony. He supposed it was admissible under the strict rule of the courts, in such cases. The true

rule would be, he thought, to admit these declarations, and then instruct the jury the weight to which they were entitled.

Judge HARRIS: I do not think the declarations would be admissible. The man himself said he thought he should die; the physicians did not apprize him that he was likely to die, but encouraged him to hope that he would recover. Now, Lanagan may have had the impression that he was going to die; but to constitute dying declarations, the person making them must be convinced that he was dying; must see death staring him in the face. Mr. Lanagan was not in this state, for when he expressed the belief that he would not recover, his medical attendants encouraged him to believe and hope that he would. It would not be safe, under the circumstances, to admit the declarations.

*Direct examination resumed.*—I do not think that at any time either Dr. Skilton or myself told deceased that he could not recover; besides myself and Dr. Skilton in the room with Lanagan, were his mother, father, brothers, sisters, and children; I think he spoke to his wife during his illness; do not remember positively; I was not present at the coroner's inquest.

*Cross-examined by Mr. Beach.*—I consider of the symptoms named, the intense pain of the stomach was peculiar to poison. There were others: burning sensation at the throat; constant retching; severe evacuations from the bowels; cramps, often; great prostration of the system; these comprise pretty much all the symptoms; the incessant retching and severe burning sensation at the throat are not common to other diseases. Independent of the severe burning of the throat, all the other symptoms mentioned are common to a variety of other diseases; this burning at the throat, I do not think is limited to any particular variety of poison; in all cases of suspected poison I understand it is customary to analyze the contents of the stomach; it is done by the faculty to satisfy themselves as to the cause of the death; without that, it is not I think in the power of our profession definitely and certainly to determine the cause of death; I have had occasion to attend a case of

cholera; in those cases there was great thirst, and a complaint of irritation of the throat, but not as severe as is common to cases of poison; I have found in the course of my practice that the recovery of the patient depends much upon the constitution, the will, and power to endure; severe retching, great pain in the stomach, &c., are strong symptoms of cholera, as is also, sudden and severe prostration, if accompanied by other symptoms, such as rice-colored evacuations, severe cramps, &c.; these evacuations do not always result from the progress of the disease and rapid dissolution of the patient; we should not always expect death to follow such evacuations; we find these rice-colored evacuations in no other disease than cholera, that I am aware of; they may sometimes occur in cholera morbus, a disease that assimilates to cholera; I would not like to give a definite opinion as to whether a safe conclusion as to the cause of this man's death, could be arrived at without an analyzation of the stomach; I understand the stomach was analyzed; I attended deceased's family for four or five years previous to his death; he was not a man of vigorous constitution; his habits I believe were regular, and he was a temperate man as far as I knew.

*Direct resumed.*—He was able to attend to his ordinary affairs, I believe, up to the time of this transaction; I was in the habit of seeing or meeting him most every week. He was about thirty-five years of age at the time of his death; the symptoms he exhibited were not those of cholera; the evacuations in no respect resembled cholera; I think I could pronounce with confidence that he did not die of cholera; independent of analysis I think I have a decided opinion as to the cause of his death, and it is such as I have named.

*By Mr. Beach.*—My question to you, doctor, was whether, without an analysis, you could form a satisfactory conclusion as to the cause of this man's death; did I understand you correctly?

Witness: You did. My opinion as to the cause of the man's death was founded to some extent, but not altogether, upon what I heard from the friends and family of the deceased.

*Mr. Beach.*—Then, doctor, I understand you to say, that judging from the symptoms alone, you could form no decided opinion as to the cause of death; but taking the symptoms together with what you heard from the family and friends, you did form a decided opinion.

Witness: I formed an opinion independent of what I heard; it is the invariable custom in case of suspected poison to analyze the stomach.

*Mr. Beach.*—Judging from the symptoms alone in this man, and without analysis, do you think you can pronounce it a case of unmistakable poison?

Witness: I think I can. It is the opinion of most medical writers of celebrity that no reliance can be placed on these external symptoms for the detection of poison; and hence results, as a general thing, this custom with our profession, of analyzing the stomach to detect poison; I still think I can express a decided opinion as to the cause of this man's death; to a certain extent I concluded poison had been administered; to a certain extent is what I mean, which might be verified by a *post mortem* examination; I should be satisfied in this case without such examination.

*Direct resumed.*—The object of the analyzing the stomach may be both to ascertain the presence of poison, and the particular kind of poison; I wish to be understood that to analyze the stomach in cases of suspected poison is the general custom, not the invariable custom.

*By Mr. Beach.*—Did you ever know a case of suspected poison that was not followed by an analysis of the stomach?

Witness.—I never knew of one.

*Mr. B.*—Then, as far as you know, it is the invariable custom, is it not?

W.—It is.

*Avery J. Skilton,* sworn: I reside in Troy; am a practicing physician; have been for a number of years; saw Timothy Lanagan before his death; saw him on the twenty-fifth of May, 1853, the day on which he died; I reached his house about five o'clock in the afternoon; Dr. Adams was not in the house

then; a great number of people were there; Mr. Lanagan was in the back room; when I got in he was on the bed; his skin was somewhat livid; his pulse very feeble; he was rolling and retching on the bed, which indicated pain; he complained of severe pain, burning at the stomach and in the throat; sickness at the stomach, retching constantly, most; frequent vomiting; the discharges from the stomach were not uniform; some of them had a dark appearance; he had discharges of bowels, but I don't recollect definitely about them; I believe they were partly bloody; from the symptoms exhibited by Lanagan, and independent of any thing I learned from the family, I believed he had been taking mineral poison; I had no doubts about it; I went there thinking he might be relieved, but after seeing him had less hope; I recollect of his saying only that he could not live; this is the only expression I heard him make on the subject of dying; he did not state why he couldn't live; said nothing in my hearing as to the cause of his illness; was present at his death, but did not remain at the house all the time from the time I first went to the house; I was present at the *post mortem* examination; that showed that the stomach was highly inflamed, in some patches and parts more than others; no chemical tests were applied to detect the presence or absence of poison; the appearances corresponded with the symptoms which led to my conclusions before he died that he had been taking mineral poison; near the lower part of the stomach was what appeared to be a white powder; in the intestines there was a greater quantity of mucous than usual, mingled with a yellow substance; everywhere, from the pit of the stomach the cyphuses were more highly inflamed; the large intestine, or colon, was singularly blanched, and led me to think of the fact of his having passed bloody stools; there were no tests applied there to the white powder — no chemical tests; the white powder was enveloped in mucous; and therefore it resembled white powder, like flour, or arsenic; arsenic is white — white powder; from this examination, coupled with the symptoms previous to death, I had no doubt he died of

mineral poison: I fully believe the poison was arsenic; the coroner's jury and coroner were present at the *post mortem;* Dr. Seymour, called by the coroner, was also present.

*Cross-examined by Mr. Olin.*—Taking the whole time I was present at the house it was not less than an hour; I was not in the room half an hour the first time, but in the house some time before I got in the room; I made examinations of the symptoms all the time I was at the house; the great soreness and burning sensation of the throat are rather peculiar to arsenic but can be swayed by circumstances some; for that symptom we rely principally upon the statement of the patient, except as we judge from the character and appearance of what he vomits. His calling for cold water was an evidence of the burning sensation; it does not attend ailments occasioned by other poisons; calling for water alone is not a decisive test of the presence of arsenic; there was no other symptom, aside from what I have mentioned, that indicated arsenic; one is more likely to have cramps from arsenic than from other poison; can't say that cramps attend poisoning by any other poison than arsenic; do not know but our medical writers say so; Beck, in his work, says that in cases of poisoning by arsenic, the fact can be safely determined only by finding the poison in the stomach.

Question by the counsel: Do you say that, by simply examining the symptoms of the patient, you can tell if he has been poisoned, and if poisoned, whether it was a mineral or vegetable poison, to a certainty.

Answer.—I can, satisfactorily to myself—without doubt; the most approved writers upon this class of subjects are Guy, Christison, Beck and Orfila; Orfila was a distinguished chemist; Beck was a medical man; I can't say that either of these writers say that the symptoms above are infallible tests; it is stated again and again, and so have I stated again and again, that symptoms should not be relied upon in a court of justice; there is more certainty in a chemical analysis; it is so held in courts of justice and medical jurisprudence, and is so in fact; symptoms are sufficient to satisfy me; that the test by symp-

The People *v.* Robinson.

toms is as certain as by chemical tests, I have not stated; in the *post mortem* examination of Lanagan, there was nothing to indicate that the poison there was arsenic, except that the powder there found was white; the white powder was distinctive evidence, though not infallibly distinctive of mineral poison; the yellow substance in the intestines was another evidence of the presence of mineral poison, though not a certain indication; I fully formed the opinion, as a medical man, that Lanagan's was a case of poison by arsenic, upon the three grounds that the powder there found was a white powder, it was not crystalline, and the yellow substance in the intestines; of the fact I had no doubt; I was not present at the chemical analysis of the stomach; do not know whether there was one; heard there was to be one; at the post mortem examination the stomach and intestines were taken in charge by the coroner, Dr. Bontecou.

*Dr. William P. Seymour* sworn: I am a practicing physician; reside in this city; have practiced here some five or six years; was present at the *post mortem* examination of Mr. Lanagan; did not see Mr. Lanagan on the day previous to his death; think the examination took place the day after his death, and think it took place in the afternoon; the *post mortem* was made by Dr. Bontecou and myself; Dr. B. was coroner, and I assisted him; Dr. Skilton was also present; the stomach presented all the appearances of very severe and very acute inflammation; I think there was a small quantity of fluid in the stomach; nothing else that I observed, except the white powder spoken of by Dr. Skilton; the quantity I could not tell by weight or measure; it was distributed over the first bowel; saw that the mucous about the first bowel was slightly tinged with yellow; supposed it was a discoloration of the unusually thick mucous; the inflammation was in all portions of the stomach; some portions more than others; this inflammation was so severe that in my opinion, as a professional man, it was sufficient to cause death; it was my opinion that the deceased came to his death by an irritating poison; I have no doubt he died from the effects of poison; Dr. Bontecou placed the

stomach and intestines in glass jars; do not know how many glass jars were there: Dr. B. had other jars there, and one already contained the stomach of a woman examined the same day, that of Miss Lubee, who died about the same time as did Lanagan.

*By Mr. Beach.*—The inflammation of which I speak was necessarily produced by poison; I have no doubt Mr. Lanagan died from the effects of that inflammation.

*By Mr. Van Santvoord.*—Did not detect other evidences of disease in the stomach, except the inflammation; there was sufficient of the powder in the stomach to enable the doctor to scrape it up with a knife, and lay it on a piece of paper; there was not a teaspoonful visible; the probability is there was more in the lower portion of the bowels, which was not opened.

*Ann Lanagan,* sworn: I knew Timothy Lanagan in his life-time; he was my husband; he is dead; he lived in the upper part of the city, corner of River and Rensselaer streets; we had lived there not quite twelve months at the time of his death; we went to live there in October, and he died on the 25th of May; I knew Mrs. Robinson; was not acquainted with her when we moved there; we had been there two months before we became acquainted; she lived directly across the street; saw Mrs. Robinson on the 25th of May, about six o'clock in the morning; saw her in my own house, in the grocery; there was no one in the grocery but myself at the time she came in; can't say how long she remained; called for a quart of beer and a pound of soda crackers; strong beer, ale; I furnished her with it; she took it out of my place with her; my husband was not out of bed at the time; saw her again about eight o'clock on the same morning; she was in the grocery again; at this time there was an old man named Haley in the grocery, who lived with Mrs. Robinson in her house; she (Mrs. R.) asked him what had kept him so long; she had sent him, he said, for the loan of two dollars; I had not let him have it; that was the first thing she said, " What kept you so long?" I answered that I had delayed him, that I had no money in the house, and that I would send to see if I could not borrow some for her;

The People *v.* Robinson.

she asked me if I was so scarce as that of money; and I said yes; she said she was sorry, but she would lend me a hundred dollars to-morrow; she left the place and went away; I should say she was in the grocery about ten minutes or a quarter of an hour, that time; she came into the grocery again about eleven o'clock in the forenoon; she told me she was in very great trouble; I asked her what the trouble was, and she told me that she had got a telegraph a few minutes before, that Robinson got hurt on board of the cars; a man was standing by, who told her not to fret; that if his wife was dead in the west, he would not fret until he saw her; this man's name was William Welch; she turned away from the counter, and went inside in the kitchen, which was right back of the grocery; there was a glass over the door leading from the grocery into the kitchen; she stopped there for some time; there was a lot of men sitting inside when she went in; they soon began to talk very loud, and I could hear Mrs. Robinson's voice; I do not know what was said; I was in the grocery; my husband was not in the house at that time; I went into the kitchen before she left; I told her to go home, that it was no place for her to be there among a lot of men; she left after a little time; no other women were in there at the time; saw her again that day about one o'clock; she came through the grocery into the kitchen; at this time my husband and Catharine Lubee were in the kitchen; Catharine Lubee's sister was married to my brother; she was stopping with us at the time; she came from Albany on a visit to see us; at this time my husband, Catharine and myself, were sitting down at dinner; she said, " Are you at dinner?" I said, yes; there was an egg on the table, and she asked, " Whose egg is that?" my husband made answer that it was hers if she wanted it; she took the egg in her hand, and my husband got up and went into the grocery. She set down to eat the egg, and I took a knife and peeled a potatoe for her, and she ate the egg and the potatoe; when she had done, she said, " You, Mrs. Lanagan and Catharine, must have a glass of beer from me." I told her I did not want any beer, that I was mostly tired of beer, and that I didn't want to drink

any beer; Catharine made an answer, and said she did not like beer; she asked me if I had got any sugar in the house; I told her I thought she didn't want any sugar; that she got nine pounds of sugar the week before; she said she didn't want it to take home, but to put it on the beer to make the beer good; I took a saucer, went into the store, and brought in some sugar; it was white powdered sugar. After bringing in the sugar, I went out for the beer; brought in some in a quart measure, and poured it into two glasses; Mrs. Robinson was walking backwards and forwards through the floor with the saucer in her hands; I did not bring in enough beer the first time to fill the two glasses; she said she should have the two glasses full; I went back and brought in some more beer from the grocery; when I came in with the second beer, Mrs. R. was after pouring the sugar into the two glasses; I poured in the remainder part of the beer and filled the glasses; I sat down to the table to take my glass of beer; she was standing by the side of me; there were two glasses of beer; the other stood before Catharine; I noticed a little foam on the top of my glass, and I thought it was some dust that was in the sugar; I took a teaspoon in my hand to take it off; Mrs. R. took the spoon out of my hand and said, "Don't you do so; that's the best of it." My husband called on me and I went into the grocery; I did not wait to see what was done with the spoon; when I went out my beer was on the table; my husband said I should go in and wait in the grocery; that he wanted to go down town as far as Mr. Morrison's. I went into the grocery, and turned around to the door and saw the glass of beer in my husband's hand; he was just putting it up to his lips to take it; heard nothing said; Mrs. Robinson left in a few minutes afterwards. Soon my husband came into the grocery; I asked him to stop a few moments; at the time my husband had the beer in his hands, Mrs. Robinson stood between himself and Catharine Lubee, near the table; did not see where the other glass of beer was at the time. I had observed a piece of white paper in Mrs. Robinson's hand; saw it when she was eating the egg and the potatoe; don't know whether Catharine Lubee drank any of

The People *v.* Robinson.

the beer, any further than she told me; Mrs. Robinson did not drink any of the beer at the time to my knowledge; after leaving the kitchen for the grocery I did not return to the kitchen until after Mrs. R. came; had no conversation with her as she passed out; she said nothing to me; she passed out through the grocery, and before my husband did; my husband remained a little while to put down some charges which I told him of in the forenoon; when I had told him what the charges were, I left the grocery and went into the kitchen, and when he was ready to go, and said I was to come, that he was going down to Mr. Morrison's and Lord's; when I returned into the kitchen the glasses were on the table empty; my husband did go down street and I went back into the grocery. Catharine came to the door while my husband was in the grocery, and asked him how did he feel after the glass of beer; this was after Mrs. Robinson left, and was after I had told him to enter some things in the book. [To the question, what did your husband say in answer to Miss Lubee's question, " how did he feel after that glass of beer," the counsel for the defence objected. Objection overruled, to which decision the defendant's counsel excepted.] He said he didn't feel very comfortable. Miss Lubee made no further remarks about it. Do not know what time it was when my husband left for down street; he came back, as near as I could state, about three o'clock; had seen Mrs. Robinson after my husband left and before he came back; she came over to our place; can not state how long after my husband went away that she came over; she came into the kitchen through the grocery; Catharine was lying on the bed at this time; she was sick; she went over to the bedside and asked Catharine how she felt; she said she felt very poorly, and that she (Mrs. Robinson) put something in the beer that sickened her; Mrs. R. said she put nothing in it but something to do her good; my husband came in at the time, and I don't recollect that any more words passed. Mrs. Robinson asked me for a glass of beer before my husband came; I told her that I thought she didn't want any beer; there was a young man in at the time, and she asked him if he would

have a glass of beer; the man said no, he didn't drink beer My husband came in at that time, and laid down on the sofa; he was very bad, hardly able to speak; I turned to him and asked if he was sick; Mrs. Robinson was standing by; he said " Send for the doctor immediately, I am done for." I did send; sent William Buckley, a man who was in the house; I turned around to her (Mrs. Robinson) and said, " What have you done! you have killed the father of my children." She said, " Oh, no, I wouldn't do any such thing!" She thought to go over to speak to him, but he put out his hand against her, and told her to go; I put my hands against her and pushed her towards the door; Lanagan's mother also pushed Mrs. R. towards the door, and helped to put her out of doors. My husband, when he put his hand up said, " Go, woman." She then left the house. Before my husband had returned, the old man Haley, came over, and said that Mrs. Robinson wanted me over to her place; I told him I couldn't go. Mrs. R. did not come back to our house after she was there; did not see her afterwards.

*Question.*—Do you see her now? Witness could not identify Mrs. R., and counsel requested that she raise her veil.

My husband died at ¼ to seven o'clock the same evening, and Catharine Lubee died at five o'clock the next morning; I saw her dead; she died at the house of Mr. James Lanagan; Dr. Adams and Dr. Skilton attended her. My husband did not leave the room after he came in from down the street; he got no better before he died; a French clergyman, whose name I forgot, was present before my husband died; he is not living in town now; he was at the house when the doctor was; Mr. Lanagan's mother had sent for him. [Counsel renewed the offer to prove the dying declarations of Mr. Lanagan. Court: Do not think it will answer.]

I became acquainted with Mrs. Robinson about two months previous to this occurrence; recollect a disturbance at our house in which Mrs. R. was concerned; it was at a dance at our house; I told her to go home myself on this occasion; I told her so because a young man asked her to dance; she wouldn't dance, and then she insulted the young man; Mr.

Lanagan and myself were by at the time. What passed between the young man and Mrs. R. I can't say. They were at the door leading from the grocery to the kitchen, and I was in the grocery; she came to the counter soon; I was behind it; the young man also came to the counter; they talked for some time; I can't say what they were talking here; she said that he insulted her, and she pulled her pistol out and said if he ever insulted her again she would blow his brains out. My husband came, and said he didn't want any noise in the place; that they must leave from there; that he would have no more noise there; I went to her and told her to go home; I went along with her to her own door; told her to keep in her own place and nobody would insult her; she came outside the door again that night, but did not come into the grocery; she called for the young man that insulted her (Smith); she asked if Smith was in there; she knocked at the door and asked the person who opened it; Smith went out, and I heard nothing further.

Can't say when Mrs. R. was next at my house; whether it was the next morning or two mornings after; she said I was a very mean woman, and that I kept rowdies in my house to insult her; she said she would get us turned out of the place, and would not let us get any license to sell; I told her that I didn't want any bother with her, to go home; she kept still talking; my husband got out of bed in the back room, and told Mrs. R. that he wouldn't stand such noise, and that she must leave the house; she said she wouldn't leave the house for him; she asked him if he wanted to turn her out when she was so good a customer; he said he didn't want her custom; he wanted to have her go away; she said she wouldn't leave; that he would have to get a constable to turn her out; I told him to go inside, and I would send her away myself; she left in a few minutes afterwards.

When I went into the grocery to get the sugar in the saucer, I got the sugar in a small box where we usually kept the sugar. The box and the sugar were taken in charge by the

coroner that night.　Previous to the 25th of May, and before drinking the beer, my husband was well; nothing was the matter with him. The beer was of the same kind that we were retailing out of the store daily.

*Cross-examined by Mr. Pierson.*—I first saw Mrs. Robinson about two months after we moved into our place; it was at my grocery; she came to trade; she continued that trade down to my husband's death; myself and husband were on good terms with Mrs. R. until the morning she came in to abuse us; that was the morning after the dance; can't say what month the dance was; don't think it was months previous to the beer occurrence; I think the dance was in the spring; I can't tell whether it was cold or warm weather; there was no snow on the ground; these dances were not frequent at our house; I don't know that we had any more than another dance before that; we have had no dances since; the Mr. Smith I speak of as having a difficulty with Mrs. R. resides in River street; his name is David Smith; he was the only strange person there; the others were my friends.　Among the latter were Dennis Lanagan, John Lanagan and William Buckley; we had a fiddler; forget whether it was a fiddler or a piper; don't know his name; Mrs. R. came to the grocery to trade on that evening; she wanted something out of the store.

Since my acquaintance with Mrs. R. I have occasionally visited her; my children went to visit her; the children's ages vary from 13 to 8 years old; after the dance, I was on good terms with Mrs. Robinson; she stopped away for some time after that, but she came back; when I requested Mrs. R. to go home, when she had the difficulty with Smith, I had no unkind feelings against her, and she manifested none towards me; I can't tell what the language Smith addressed to her was; did not hear the words; Mrs. Robinson was at our grocery nearly every day until the dance time, when she stopped away three weeks; Mrs. R. kept an account with us; she paid her bills when requested to; she owed us $14 at the time of my husband's death; part of this has since been paid; she used to borrow money of us, and always paid it again; can't tell

how much her trade amounted to in a month.   On the morning
she called to borrow the $2 I had the money in the house, but
did not want to let her have it; did not say on the stand that
I did not have the money in the house, but did tell Mrs. Rob-
inson so; am not in the habit of lying; it was not much lying
what I told Mrs. R., for I did not want to refuse her or let her
have the money; the old man Haley told me he didn't see what
she wanted to do with the money, for she had every thing in
the house that she wanted.

Did swear on the coroner's inquest that there was no cause
of enmity between myself and husband and Mrs. Robinson;
said nothing before the coroner about the difficulty at a ball;
the day on which Mrs. Robinson told me about Robinson's
death by the cars was the same day on which my husband's
death occurred; at the 12 o'clock visit she ate an egg and a
potato; she said we should have a glass of beer from her; I
declined; Miss Lubee said she didn't like beer; she said she
would not leave the house until we had the beer; we had never
had any arsenic in our house; I had never seen any arsenic;
my beer was all ready to drink when my husband called me,
and I went to wait upon him; Miss Lubee asked Mrs. Robin-
son, if she wouldn't have a glass of beer; I did not about this
time drink a glass of brandy and water; did not say that,
having got tired of beer, I would take some brandy; Miss
Lubee had been at our house seven or eight days at the time
of this occurrence; she was twenty-five or twenty-six years of
age, unmarried, and resided, when at home, in Albany; she
did not lodge with us; she stopped in the day time with me,
and went to Mr. James Lanagan's to lodge nights, as I had no
bed for her; Mrs. Robinson knew Miss Lubee; she got ac-
quainted with her at my place; they conversed together on
friendly terms; Mrs. Robinson came for Miss Lubee at our
house once; and afterwards I went over and brought Miss
Lubee home; think this was about a week before the death of
my husband; I got the sugar from the box in the grocery;
the box was open; the box stood inside the counter within
reach.

Mrs. Robinson, when invited to partake of the beer, said she didn't feel like taking any at present; do not know that Mrs. Robinson did drink of the beer with Miss Lubee, and did not know that she was sick and vomited after the beer was drank; don't recollect that when Haley came for me, after the beer had been drank, to go over to Mrs. Robinson's, he said that she (Mrs. R.) was sick; the paper which Mrs. Robinson had in her hands was white, and she held it on her two fingers; I can't say whether it was folded or rolled up; it was clean white paper; it was a little bit before he died that he told me to make the best of it, that he was done for; it was before the doctors came in; I was not with Catharine Lübee when she died; know at what time she did die only from what I was told at the time; the names of the men who were in the back room, and with whom Mrs. Robinson had the talk in the back room on the day my husband died were William Buckley, Patrick Galligan and others; I know not what they were doing there; don't know whether they were playing cards there; they had some drink there; I had known Catharine Lubee about three years; she had before visited us in Troy; she lived with me thirteen weeks caring for her sister, who was in a dying way; this was before we kept the grocery; this might have been a year before we kept the grocery; this was her first visit to us since we had kept the grocery; I can't tell you from whom I heard that Mrs. Robinson was sick; I think I heard of it the day following my husband's death; can't be certain; Haley did not say she was sick when he came over; knew that Mrs. Robinson was in jail the day following the death, but heard she was taken sick before going to jail.

*William M. Ostrom.*—Reside in Troy; I am a druggist; that was my business some time previous in the month of May, 1853; my store at that time was at the corner of River and Federal streets, near the bridge, considerably south of the residence of Mrs. Robinson; I did not know a Mrs. Robinson at that time; should know her now, if she would raise her veil. That is the lady sir; she was in my store several times in the month of May, 1853; in that month she purchased arsenic at

The People *v.* Robinson.

my store; it was in the form of a white powder; it was be-
tween the 10th and the 25th of May; she bought, as near as I
recollect, two ounces; she was also at my store on the 25th of
May, between five and seven o'clock, about half an hour pre-
vious to her arrest; had conversation with her at that time;
when I came in from tea, I found her in the store very much
excited; she said she was in trouble; had been charged with
poisoning a couple of persons; I think she mentioned Lana-
gan's name for one, and said they resided opposite where she
did; I asked her why they should suspect her of the crime;
and she said she supposed it was out of revenge, because she
would not lend them a hundred dollars; that she did not want
to draw that amount of money out of the bank in the absence
of Mr. Robinson; she said she was very much in fear of the
neighborhood, and wanted my advice as to what she should do
to be protected; I referred her to the chief of police, Amasa J.
Copp; told her it was his duty to send a posse of officers with
her if it was necessary to see that she was protected; she had
a revolver with her on that occasion; I probed it with the han-
dle of a pen, I found one barrel loaded; there were three or four
percussion caps on the hammer of the pistol, but the lock was
so rusty that I doubt if it could be fired off; I think the cap on
the barrel loaded, the one that I probed, was in good order;
on the Saturday evening previous to the arrest, Mrs. Robinson
was at my store, and had a pistol with her; it was about 10
o'clock in the evening when she came in; on her visit to my
store on the 25th, she said she had gone over to the grocery in
search of her gardener, and that while there she was about
drinking beer with Mrs. Lanagan and others, there was some
confusion about the handling of the tumblers and that Mr.
Lanagan was taken sick, and they accused her of putting
poison into the beer.

*Cross-examined by Mr. Beach.*—I furnished a written state-
ment of the transaction I have related, about the time of the
meeting of the first grand jury after the arrest was made; I
can state that one of the barrels of the pistol was charged;
can't swear that more than one was; I think that the rust on

the other caps rendered them useless; I first spoke of her call-
ing upon Mr. Copp for protection; she did not voluntarily give
me the pistol; I requested it, and she gave it to me promptly;
she said she wanted the arsenic at the time she purchased it
(between the 10th and 25th of May) for killing rats; that she
was living in the vicinity of Boutwell's Mills, and rats were
abundant there; this was voluntary on her part, while I was
putting up the article; I think she got the arsenic within two
or three days of the 10th of May; she called in the store again
the same day, and within an hour's time after the purchase of
the arsenic; she was very much excited at the second time she
called; I never noticed anything peculiar in her appearance
only when she called the second time after the purchase of the
arsenic, and on the 25th; this last time she appeared fearfully
apprehensive and restless; she looked around apprehensively;
did not appear like the same woman, either in dress or manner;
she was standing when conversing with me on the 25th; she
was very nervous, and was not in one position any time, walk-
ing all over; I had noticed in her former visits she had the air
and appearance of an accomplished lady; on the 25th she was
not well dressed; it was disordered; her language was more
bold; only on one occasion, previous to the 25th, had I noticed
this change in her appearance; this was on Saturday evening
when I saw a revolver, or the muzzle of one, in her dress.

*To Mr. Hogeboom.*—On this Saturday evening I speak of,
judging from her appearance, flushed countenance and excited
manner, I have no doubt she was in liquor; when I saw her on
the 25th, I don't think she was so much in liquor as on the
Saturday evening previous; I can't say that she was in liquor
at all at this time, because there were other causes which
might have caused her excitement on this last occasion; I mean
the accusation; the arsenic I sold her was wrapped up in two
papers and both were labeled " poison;" both wrappers were
white.

*To Mr. Beach.*—On the Saturday I speak of, her excitement
and mode of dress, her flushed countenance and language, led
me to believe she was intoxicated; her language was not as

The People *v.* Robinson.

polished, not as good as formerly; having a revolver was another reason why I thought she was intoxicated; she made use of no vulgarity that I recollect of; the excited state of her mind, and the flush in the face, might have been produced by other causes than liquor; they might have proceeded from a deranged mind connected with a diseased state of the bowels.

*To Mr. Hogeboom.*—I pretend to have no particular knowledge of the subject of the symptoms occasioned in mind or body by mental excitement not superinduced by liquor.

*To the Judge.*—The time she returned to the store after purchasing the arsenic, I noticed she was flushed in the face.

*To Mr. Beach.*—She was a florid complexion usually.

*Dr. Skilton,* recalled.—Was called to see Catharine Lubee; saw her in North First street, at James Lanagan's; saw her some twenty minutes after I first saw Lanagan; not far from five o'clock; Dr. Adams was not present; was with her for some ten minutes; saw her after Mr. Lanagan's death; very soon after; was with her about ten minutes; her symptoms indicated mineral poison; they were similar to those of Mr. Lanagan's but they differed in degree; was present at her post mortem examination; that indicated the same as in Lanagan's case, death from mineral poison; I know of no chemical tests in her case; judging professionally, I have no doubt she died from mineral poison, and that that poison was arsenic; it is not a general custom of physicians in case of poison to analyze the contents of the stomach; it is their custom to do it when they are ordered to do it; I have had some familiarity with cases of poisoning; I recollect the priest being in the room with Lanagan when I got there; do not know his name.

*Cross-examined.*—It is the general custom of coroners in these cases, to order the stomach to be analyzed; it is done on their order, and not by physicians voluntarily.

*Charles Burns,* sworn.—Resides in the city of Troy; was an officer at the time of Mrs. Robinson's arrest; I made the arrest next door to Owen Clark's drug store, above the Mansion House; I believe the arrest was made the same day the alleged offence was committed, between six and seven o'clock

in the evening; Mrs. Robinson when I went into the store asked me if I was a police officer; I told her I was; I arrested her, and on the way to the jail we laughed and joked; I visited her house afterwards in company with Bowman, Bontecou and Camp; found no one on the premises; she had given me the key of the door; went in the front door; we searched the house through; we found there only Mrs. Robinson's household furniture and clothes; I found some arsenic under the corner of the carpet; it was done up in a piece of white paper; Dr. Bontecou took it; it was found near the head of the bed, in the middle room, where there was a bed; it was close against the wall; the carpet was tacked down; when I arrested Mrs. Robinson, I found a couple of pistols on her person; Dr. Bontecou took them in charge; two of the barrels of one of the pistols were loaded; we had to take them from her; Mr. Price the sheriff, and George Kennedy and myself took them away from her; this was at the jail; I did find a piece of white paper in her pocket at the time of the arrest; there was nothing in it, and I threw it away.

*Cross-examined by Mr. Beach.*—I did not observe what she was doing in Perkins's shop at the time I arrested her; I saw her doing nothing; we walked to the jail; on our way to jail she said she looked rough and dirty going through the streets, but it was a muddy, rainy day; I thought she talked lightly; she asked me if I was not going to take her to Robertson's office; I told her yes; this was in Second street near the Mansion House; we went down Albany street to Fifth, and from thence to the jail; our course was almost directly from Robertson's office; she made no remark in regard to the course I was taking her; the carpet was nailed down over the paper of arsenic that we found at the house; there was a paper of Spanish flies also found there; there was a box of jewelry, a watch, and a locket found there; the pistols I took from her looked pretty rough; she carried them in her bosom; she resisted giving them up.

*Mr. Beach.*—Well, she wishes to know what became of her locket?

The People *v.* Robinson.

*Witness.*—Dr. Bontecou took charge of every thing found, including the key of the house; when we got to the corner of Ferry and Fifth street, I pointed to the jail and told her there was the place; there was quite a party of fellows on Murphy's corner, and she asked me to let her walk up the hill a little ways, while I should stand on the steps; I allowed her to do so; she walked up the hill a little way, returned immediately and walked into the jail hall; she seemed surprised to find herself in the jail; I speak of the powder found in the paper at the house as arsenic, not from any knowledge of my own but what others told me.

*To Mr. Van Santvoord.*—When I went into Perkins's shop I said "good day" to Mrs. Robinson; this was all that passed, until she asked me if I was a police officer.

*To Mr. Hogeboom.*—Murphy's corner is corner of Fifth and Ferry; she walked up the hill perhaps half a block; not out of my sight; she did not state why she wished to walk up; she expressed no surprise in words in finding herself in jail; when I told her she was in jail she said nothing; I had never seen Mrs. Robinson before the day of the arrest; she looked startled, as most any body does who goes to jail.

*Burr Lord,* sworn: Reside in Troy; follow the grocery and provision business; and am one of the firm of Morrison & Lord; our store is 399 River street; knew Timothy Lanagan in his life time; he was at our store on the 25th of May last; he was there twice; he was there about nine o'clock in the morning, and between one and two o'clock; in the afternoon he came down, I suppose to look at some beef; he remained five or ten minutes; he made no purchase; he said he was sick; said he was very sick; stated nothing of the nature of his sickness; he looked sick; did not state where his pain was; his eyes looked bad, and his lips looked very blue; he left the store and went towards home.

*Reed P. Bontecou,* sworn: Reside in Troy; I am a physician by profession; have been a physician about nine years; lived in Troy in May last; was the coroner of this county; held an

inquest over the body of Timothy Lanagan; a verdict was rendered by the jury. This inquest was held on the evening of the 25th day of May, 1853; I made a post mortem examination of the body; this was done at the house of the deceased, the following day; quite a number were present; I think the jury were, as well as Dr. Skilton and Dr. Seymour. I was associated with Prof. Dakin in making an analysis of the stomach; I took the stomach from the body myself; we analyzed the contents of the stomach during the latter part of May and in the month of June; the analysis continued two or three weeks; we applied chemical tests with a view to ascertain the substances which the stomach contained; we found poison in the stomach; it was arsenic. We applied several tests; they all resulted in showing arsenic; we found forty grains of arsenic in the intestines, which had passed through the stomach; there were enough to produce death; I can state professionally that he died of arsenic. Saw and took charge of a box of sugar at the house of Lanagan; it was white, granular sugar; I got the sugar from Mrs. Lanagan; it was behind the counter, in the store part of the house, on one of the shelves; she told me it was all the sugar there; saw no other sugar. The box was in such a situation that it could not be touched, except by a person getting over the counter; of the sugar there was perhaps three or four pounds; I took possession of the sugar and kept it until the time of the analysis. Professor Dakin and myself analyzed the sugar; we tested for arsenic; discovered none; there was none; we discovered no foreign ingredient. In analyzing the sugar we applied one or two tests previously applied in analyzing the stomach, and those were the most delicate tests, the proper ones. I am not a professional chemist; Professor Dakin is. We tested the beer at Lanagan's by drinking it; it produced no unpleasant effect; it didn't kill me; there was no poison in the beer; some of the jurors drank it, as did one or two other persons; I know of no injurious effects being produced; it was drawn by Mrs. Lanagan from a barrel in the store; I saw her draw it. I went to the house of Mrs. Robinson; I was not acquainted with Mrs. Robinson previous to this

The People *v.* Robinson.

transaction; had never seen her; her house was nearly oppo-site, a little above the place of Lanagan's. There were many things in the house usually found in dwellings; we found arsenic there; it was in the back parlor. There was a bed in this room; the arsenic was in the southeast corner of the room, under the carpet, between the bed and the south wall; it was wrapped up in a paper somewhat soiled, and as near white as may be; the arsenic was not done up in regular form; it was not in apothecary style; there was one drachm, about sixty grains, of the arsenic; I took a portion of it; it was the article commonly known as arsenic; we tested it and found it to be arsenic. On the 25th of May I saw a person named Catharine Lubee, alleged also to have been poisoned; saw her at the house of James Lanagan, a relative of the deceased person; it was about nine o'clock in the evening of the 25th; the coro-ner's jury was also there; I took them there for the purpose of taking her evidence on the inquest of Lanagan; she was sworn, and I took her evidence in writing; she was lying in bed at the time; she appeared ill; she appeared sick at the stomach; occasioned, as I supposed at the time, from something taken into the stomach; she vomited; did not purge, to my know-ledge; think she asked for drink one or more times while I was there; did not complain of a burning sensation in her throat. It was my professional opinion at the time, judged from what she told me, and not alone from appearance, that she had been poisoned. [Objected to and ruled out by the court.]

The counsel for the prosecution here offered to prove by this witness that he and Prof. Dakin made an examination of Miss Lubee's stomach after her death and found poison therein, to which the counsel for the defendant objected. The court over-ruled the objection, and the counsel for the defendant duly excepted.

I examined the stomach of Miss Lubee after her death, in company with Prof. Dakin; found arsenic there, and think she died of the effects of that poison; applied the same tests in her case as in the case of Lanagan. I do not know that at the time I saw her she had hopes of recovery; I told her she would

recover, and I thought she would at the time; I do not know that she expressed an idea about it. There then seemed to be a prevailing impression about the room that she would not recover; I approached the bed and put my hand on her pulse, and spoke a few words to her; I told her that I thought she would recover; she said that she felt very sick. I did not change my opinion about her recovery before I left, and communicated no different opinion to her from the one I first expressed to her. I held an inquest on her body on the 26th of May, in the morning about nine A. M. I made the post mortem examination of Miss Lubee before I did that of Mr. Lanagan. The arsenic that I found in the stomachs of these two persons was of the same kind I found at the house of Mrs. Robinson.

*Cross-examined by Mr. Pierson.*—The tests were principally conducted by Prof. Dakin. First saw Mrs. Robinson on the evening of the 25th, after nine o'clock; she was not, to my knowledge, at either of the coroner's inquests; I conversed with her in the jail; at the jail I conversed with her; she seemed much excited, and not entirely rational; she was dressed in a short gown; her person was not exposed; I took from her her key on that occasion; I went with it to the house where she had been residing; found the arsenic as before stated; found, also, under the carpet, and by the arsenic, a box of jewelry, a watch and chain; will not be positive about a locket; think there was one; the watch and chain, I think, were in the box; there were breastpins, cuffpins, earrings and articles of that description. I next saw Mrs. Robinson in jail the day following; conversed with her then; it was much the same as on the evening before) I thought she was not rational; she acted strangely and quite unnatural; her answers to questions were not satisfactory; I did not get the information I asked for; I went to ask her about her furniture; her answers were not pertinent to the questions I put to her; I staid with her on this occasion ten or fifteen minutes; there was a wild, unnatural appearance to her eyes; I can't say her motion was any way peculiar; I mean her gesticulations; she was sitting at the time.

Before I came away she left her chair and walked to the window; I saw her on several occasions during a fortnight after the occurrence; two or three times a week I might have visited the jail; I was always impressed with the idea that she was not rational. I told her once that I heard that Lanagan and Miss Lubee were dead; she took no notice of the remark that I could see; so far as I could judge, I think she did not know what I meant. I did on one occasion charge her with poisoning those persons; it was during the second or third week of my visits; my expression was this: " You know you have poisoned those people, and I want you to tell me about it; all about it." She made no answer to this, but went on clattering away with the same jumble that she had usually had over; I could not see that she comprehended what I meant. From the beginning to the end of my visits to the jail, I became satisfied that on all the occasions I saw her, she was not a rational woman. The jewelry, &c., found at Mrs. Robinson's house, I gave up to Dr. Hegeman.

*To Mr. Hogeboom.*—I should say my visits lasted some two or three weeks; may have been longer; no person employed me to visit her; I was not requested to attend her; it is possible that she may have requested me to call; I do not recollect that she ever sent for me, or requested me to come and see her; I have not been paid for those visits; I never saw her before the evening of May 25th, '53, to my knowledge; after I had relieved myself of the care of her property, my visits were discontinued; I attended her person as long as I had charge of her property. I have been called upon to see insane persons to testify in regard to insanity, but not with a view of treating them medically; I never had a person under my charge for the treatment of insanity; my residence has been in this city since I have been in practice, with the exception of one year when I was in Brazil, South America; I should say I have been called upon to inspect some twenty or thirty persons supposed to be insane; so called upon in and about this city; these persons were not charged with crime, nor were they in hospitals; it has usually occurred in private practice; and I was called upon to testify before a judge in order to get them to the

asylum; all of them were not cases of this description; some of the subjects were inmates of the almshouse; the examinations were for the most part single examinations; called upon them once; recall one whom I examined twice; I am thirty years of age. On the evening of the 20th of May, when I first called at the jail, and during my interview with Mrs. R., Charles Burns, Francis Bowman, Nathan H. Camp, and the officers of the prison were present; I was there about ten minutes; I told her I had come to search her person; I forget what reply she made, but she was laughing at the time; I recollect that she made replies to that remark; the reply was not touching the subject; I did search her person; she facilitated the search by standing passive, and raised her hands; she offered no resistance to my search; I made the remark that I had come to search her person when I first entered the room; she was in a distant part of the room, but what I said was audible, and as I approached her, she elevated her hands, as I have stated; I can not repeat the remark, or the substance of a remark or question that I made to her on that first interview; I considered her dressed unusually at that time; singularity of dress was not one of the elements of the judgment I formed as to the state of her mind; her eyes had an unnatural and wild appearance, and her countenance an unusual expression; when a person is fearful or terrified, the eye will sometimes assume a wild and unnatural appearance, and the countenance an unusual expression. This will be more or less the case sometimes in a person in liquor, or of the use of liquor, even before the approach of delirium tremens; insanity is sometimes simulated or feigned; I don't think I ever saw a person who feigned insanity; don't now recollect of having seen one. I read journals on insanity, periodical publications; have never made it a particular study; think I have read some works on insanity; from what I have read, I have the impression that it is laid down that it is not difficult to distinguish between real or feigned insanity; in some cases, I think it requires a close and long continued examination; I think, I will not swear with certainty on that point; think the longest interview with Mrs. Robinson at

the jail was as long as twenty minutes; my usual visits were as long as ten or fifteen minutes.   I think Mrs. R. complained of being ill, or the jailer told me she was ill, on one or two occasions.   The jailer's name I do not recollect; it was not Dr. Hegeman; I can't state at which interview I was told about Mrs. R.'s illness, only that it was not at the first; I did not prescribe for her at the time; I did not attend her for medical purposes; my visits generally were in reference to her affairs, her property; I had the keys of her house; I made up my mind at the first interview that she was not rational.

Q. Will you tell us what induced you to go two or three times a week to see a crazy woman about her property?

A. There were no inducements held out to me, sir; at the first interview, I asked her for the keys of her house; I forget whether she handed me the keys, or whether I took them from her pocket or dress; when I asked for the keys, she made no reply, but kept on talking; I think I got the keys shortly after I asked for them; there was nothing about the transaction of getting the keys from her that produced the impression in my mind that she was not rational that I now recollect; I can not tell what she did talk about at the first interview; I do not recollect her remarks, or the substance of them, at that interview; do not recollect that at this interview Mrs. R. requested that her clothes should be sent down to her from her house; I have forgotten entirely the details of the conversation at the second interview; I do not now recollect any thing she siad then in substance; my remarks to her were something about her property; I think she said nothing to me about her property at the second interview; I recollect that she was talking and laughing about, but I do not recollect any observation she made, or the subject of it; I forget whether the jailer was present at this interview or not; Mr. Price, or his deputy, Dr. Hegeman, may have been tnere; can not state positively that any one was present; my impression is that one of those I have named was in the room or at or near the door; I was inside; I think the door was not locked; I think she did me no bodily harm; I recollect one day of having remarked to her that I had

heard that Lanagan and Miss Lubee were dead; she made some observation, I think not in reference to it; I know she made no observation in reference to it; she talked about something else; it had no reference to the subject; I can't tell what she said did relate to; my remark made no change in her countenance; she did not seem shocked or startled at what I said; one day I asked her if I should give up certain articles (some utensils, a boiler and spider, and a bonnet, I believe) to Mrs. Lanagan; I told her Mrs. L. wanted those things; had been to me for them; Mrs. Robinson replied, " Why not?" I think this was the only allusion she ever made to me in regard to Lanagan or his wife; the articles were asked for, as I understood it, as Mrs. Lanagan's articles; I regarded the answer as pertinent to the subject — as rational; at some of the interviews she talked about dresses, but I do not recollect distinctly what she said about them; I don't think it irrational to talk about dresses, but the remarks about them at this time I regarded as irrational; because the remarks were disconnected with any other subject; I sent down dresses to Mrs. R. from her house: do not recollect whether this was in pursuance of a request from her; it was either herself or some person connected with the prison, who requested it, I think; don't know that I sent them down to her in consequence of the remark of hers about dresses; don't recollect that she requested dresses to be sent down; if such a request was made to me by her, I have forgotten it; I do not recollect that she put any questions to me about the jewelry; Dr. Hegeman, I believe, was my successor in the charge of her property; I gave the keys to him; no person requested me to do so, she did not; I did tell her on one occasion, " you know you have poisoned these people, and I want you to tell me all about it," and she made no reply to it; it seemed strange to me that the remark did not affect her expression or manner; it did not seem strange to me that she did not admit the charge: it was not an evidence of the absence of reason; it would not be strange in a sane person to rather evade such a question, but I should think she would say something in regard to it; I made remarks at all these interviews

about her property, but what they were, or the substance of them, I do not now recollect.

*To Mr. Beach.*—In the course of my medical practice I have often had patients temporarily delirious, &c; my practice has been tolerably extensive; I have managed to get a living by it; I have repeatedly had occasion to consult with Dr. Brinsmade; was associated with him in business some ten years; at my first interview with this lady, the expression of her eyes did not strike me as that of drunkenness, neither did her face indicate a state of drunkenness; in the course of my several interviews with her, I directed my attention to the condition of her mind; partial alienation of mind is a form of insanity; my recollection of those interviews is, that her answers to my questions were not generally responsive; at most every visit she appeared full of levity; her failure to reply directly to my questions was one of the reasons that led me to believe that she was not rational; I do not know whether she had access to stimulating drinks after her confinement in jail.

*Prof. Francis E. Dakin,* of Albany, sworn.—By profession, I am a chemist; I have been for several years in the habit of analyzing various substances; I conducted the analysis of the contents of the stomach of Mr. Lanagan and Miss Lubee, in connection with Dr. Bontecou, at his house; we discovered arsenic in both the stomachs; we applied five or six different tests; each resulted in showing the presence of arsenic; I have no doubt of the presence of arsenic; we found the arsenic and the compositions we obtained from the stomach are before you in the jar; we found arsenic in considerable quantities, I should judge to produce death; I am not a physician; we analyzed the sugar also; found no arsenic in that; Dr. Bontecou's family used the sugar afterwards; we analyzed the forty grains of arsenic taken from the stomach, and I took the mucous found in the stomach of Miss Lubee, and found arsenic in that; the contents of the paper found at Mrs. Robinson's residence we also analyzed, and found it to be arsenic.

The prosecution here rested and the following evidence was given by the defence:

*William H. Hegeman,* sworn.—Am a practicing physician; have been jailor for a year and a half, and two years have practiced as a physician; was jailor at the time this woman was arrested; had never seen her to know her previous to that time; during her confinement in jail, I have seen her usually three times a day, except on days when I have been away; I lodge at the jail; saw her on the 25th of May, going up the stairs of the jail, and once in the room, but had no conversation with her; did not examine her appearance on that evening; do not remember now that I heard any conversation between her and others on that evening; saw her on the next morning; could not say who was present; think the sheriff was present; I spoke to her; her appearance was strange, singular; her dress was much disordered; her eyes seemed to have an unnatural appearance; her countenance seemed to me to be expressionless; she didn't seem to realize her condition; had no conversation with her to any extent at that time; she came in on the evening of the 25th May, 1853; I believe she staid the first night in the first room she entered — the room usually occupied by women; on the morning of the 26th saw her and asked her if she would not like to have another room; she was then put up stairs in the room she now occupies; her remarks, whenever she did make any, were disconnected; she seemed irritable and sullen; when she was on her feet, her movements were very quick and very impulsive; she so continued, at least, when I saw her; I do not remember how she passed the night of the 26th, but on the evening of the 27th I watched at her door; the reason of my doing so was that she seemed to be raving, calling for assistance to protect her, and passing violently from one end of the room to the other; this continued all night; at nearly daylight I left the room and went down stairs; her door was usually locked between eight and nine o'clock in the evening; the first week or two I could draw but little conversation from her; I think I spoke to her at the time of the funeral of the deceased; told her I supposed the funeral ceremonies were about this time being performed; she looked a little sober at this, and said, " it is queer, isn't it?" and com-

menced talking and laughing on some other subject; this was all she said on the subject of the funeral; I endeavored to satisfy my own mind what the condition of hers was; I thought her of unsound mind; I have discovered great reluctance upon her part to be thought insane; since she has been in the jail she has destroyed part of her furniture; of six sofa-bottomed chairs, she has destroyed five; she had a table which she partly destroyed; she has destroyed dishes, and a silver cake basket; she has complained of ill health a good deal since she has been there; I could not say what the state of her health was when she first came to the jail; for the first three or four months she was in the jail, she had no intoxicating drinks; last fall she had some as a medicine; I directed it; it was in July or August that it was supposed that she would die; I was absent at the time; was not physician to the jail, and was not the person called; got home before she recovered; Dr. Adams was physician of the jail at that time; I did not know from an examination of her condition what had been the matter with her.

*Cross-examined by Mr. Hogeboom.*—Am twenty-six years of age; I graduated between three and four years ago; practiced medicine about one year; graduated in the city of New York, at the University Medical College, Broadway; practiced medicine one year, aside from two years I have been physician to the jail; practiced in Troy; became deputy sheriff about three months after my first year expired as physician to the jail; I was physician to the jail at two different times; the first time from the fall of 1851, till the fall of 1852; the next January I was appointed deputy sheriff and the next September or October I was appointed physician to the jail again; could not say positively at what hour on the morning of the 26th of May I saw Mrs. Robinson. It was perhaps between nine and ten o'clock; her dress was disordered, it was hanging loose on her, was dirty, as though long worn without being washed. It was a slate colored morning dress; the one she came to the jail in; she had no other there then; I procured some thing for her from her house; her trunk was sent to the jail before;

she dressed better after this, when she dressed at all; never saw her without a dress; have seen her in her night dress all day.

At the time I speak of her eyes had a wild appearance; it seemed impossible to catch her eye; this is not so much the case now; should not think this a sure mark of insanity; some persons differ in the appearance of the eye; some have that wild appearance of the eye more than others; I think she. is of unsound mind yet; but not to so great an extent as formerly; think she has been partially of unsound mind ever since she has been in the jail; more so at some times than at others; by partially of unsound mind, I mean that it was more apparent to me at one time than at another; I think the appearance of unsoundness is not so extensive to-day as I have seen it; not so readily observed; can't say why not so readily observed, unless because she is or seems more cautious; her countenance is not now so expressionless as it was when I saw her on the 26th of May. On that day her eye was wild; but I could not gather from the expression of her countenance as to what she wanted; I had no considerable conversation with her; when asked if she would like another room; I am not certain that she made any reply; if she did make a reply, it was neither of assent or dissent; I know this because I thought it strange that she gave me no answer; I know that I asked her the question; whether she answered or not I don't know. To the question: do you possess that degree of medical knowledge and skill that would justify you in passing an authoritative opinion on a person's sanity, witness answered, perhaps not. In my private medical practice, never had but one case of insanity. I was the attending physician in that case.

We have had three or four cases in jail; the case of one man was brought in from the country; those who brought him there said they could not well take care of him, and wished to have him kept there. The cases I speak of were not desperate cases of insanity; irritability and sullenness do not always attend insanity; don't think sitting still on a chair, when a person is seated, is remarkable; the night of the 27th, when I watched at her door, I was apprehensive she might destroy herself;

The People *v.* Robinson.

think I was not told to watch; she seemed to be raving; called on the watch and police to protect her; could not hear all she said, and do remember only the words watch and police, and saying she should be killed; at this time she hadn't been supplied with any liquor, to my knowledge; do not know that opium was sent for, for her; don't know that she requested it; don't think she had any; I do not know that during her stay in jail she has been supplied with any other stimulants than liquor and snuff. It was two or three days after she was committed that I spoke to her about the funeral; don't think I mentioned to her, in speaking of the funerals, the names of deceased persons; think I said the funeral of the man and woman supposed to have been poisoned, is taking place now. The answer she made was "it is queer, isn't it?" and commenced talking about some articles of her dress; I arrived at the conclusion that she is reluctant to be thought insane, recently. I did not at any time communicate to her that if on the trial she was found insane, she would not be discharged but would be sent to an asylum; a few persons have seen her in the jail; I think it was at the Oyer and Terminer, in February, that I first thought she didn't like to be thought insane; she told me so; she said she was not insane now, that was the time we had conversation; she didn't tell me when she stopped being insane.

It was last winter some time that she broke up the chairs; she broke up five out of six; she had a rocking chair of her own; that she didn't break; this was after she had been indicted; she had been brought into court to answer to the indictment; she broke the chairs in pieces and burned them up; I think she was mad at somebody; don't know she said so in words; she had no particular difficulty at that time with any one; she was of violent temper; there were other things in the room which she didn't destroy; three tables, a wash stand, a looking glass, wardrobe, bed, &c.; some of the dishes were hers; others were not; she tried to melt the silver cake basket; I asked her why she destroyed them; she said they were hers, and she would do with them what she pleased; I did not pie

scribe ardent spirits daily; supplied her with brandy part of the time; sometimes wine; mostly brandy. When she complained of being unwell I prescribed spirits for her; don'; think I carried ardent spirits up to her more than six or seven times; do not know whether Dr. Adams prescribed brandy too; her complaint was diarrhea, headache, sleepless nights; she asked me for brandy; this was a month or two before I began to be physician to the jail; she asked me for brandy before, and I refused; she never asked me for beer; occasionally got snuff for her.

*To Mr. Olin.*—Do not know any thing of this woman's husband.

*To Mr. Hogeboom.*—The liquor that I ordered was the only liquor or wines sent to her room that I remember of; the sheriff sometimes has the key; the man who assists us also has access to the key of her room; know of no little indulgences she had in that way; Dr. Adams might have left her a few pills of opium; remember of prescribing none; have prescribed Dover's powders for her occasionally; opium in any other form, I have never prescribed for her.

*Mary J. Dillon* sworn; reside in Troy, in the upper part of the city; I know Mrs. Robinson; I resided but a short distance from where she did; saw her frequently before she was put in jail; my business was dress making; some time in March, 1853, she came in and asked me if I did plain sewing; I told her I did; she had a dress she wanted me to fix; I told her that I had so much sewing in the house that I didn't see how I could do it right away; she said she wanted it done so bad, she would pay me any price to fix it for her; she then told me it was too short in the waist; she had the dress with her; I told her I didn't think I could make it any longer in the waist; she then told me to let the waist go as it was and to fix the other part; don't recollect who she said cut the dress; I believe she told me first that she cut it herself, and afterwards that a dress-maker cut it; she said that Oliver Boutwell himself and his family had slandered her; she told me her name was Mrs. Robinson; she told me she was a lord's daughter in

Ireland; that she was turned away from her father's castle for marrying a poor man; she then cried; soon afterwards something seemed to pass her mind, and she laughed, and danced about the floor, and began to tell something; I don't recollect what it was.

At another interview, quite a spell afterwards, she showed me a daguerreotype, representing a lady with a bundle of flowers; she said it was the daguerreotype of her mother; she said the flowers were gathered in the garden of the king of France; she said her mother gave her this likeness when her father turned her away; she told me another time her mother died when she was a small child; another cause of her being turned away was her stepmother. This was at the time she told me her mother died when she was a small child; it was at another time she told me her husband was a lord in Ireland; she told me one time she was educated in a nunnery; at another time she told me she was educated in Mrs. Willard's Seminary; she told me at one time, after her father had sent her away, he sent for her to come back, that he would forgive her; she said, at one time, her father had sent her $150 dollars to purchase a single dress to appear in court against Oliver Boutwell for slander; she said she could jump into the river and swim until she got tired, and then she had a cork which she could put between her teeth, and rest in the water and not sink.

I was on the bank of the river with her, near her house, which was near the bank of the river; before she went on the bank of the river, she saw a boat coming down; she said that Oliver Boutwell had stopped the navigation, and the boat could'nt pass; while on the bank of the river, she began to hoot at the hands on the boat, but they did not hear her; she had a revolver in her hand, and began to climb up the rocks; she got about half way up, and turned to me and said, " Mary Jane, would'nt I make a good soldier? " She said she was sick at one time, sent for Dr. Buswell, he came and left her a bottle of medicine; she said she suspected the medicine was poison; said she went to a neighbor and got a dog and gave the dog some of the medicine; said the dog died within half

an hour; she then said she put the cork in the bottle and threw it into the river; that some one found it and brought it back to her; she said she paid $5 for the dog; was frequently at our house; recollect of her coming there one time without any dress on; it was about a month before she was put in prison; it was about half past four or five o'clock in the morning; she had a night dress on, and a white sun-bonnet; had on no shawl; only my brother was up at the time; she wanted me to lend her a dress; she said she wanted to go down street to purchase a revolver, and take out a warrant for Dave Smith; I let her have my clothes; she went off with them; that same day I sent my sister for the dress; recollect of her coming to our house on another occasion about eleven or twelve o'clock in the night, in March or April. The family were in bed; she woke us up; she wanted my sister to go after Dr. Buswell; that her husband had just come home then, and was very sick; she told my sister if she would go she would give her a revolver to take with her and pay her a sum of money, the amount of which I don't recollect; my sister told her she didn't want to go; Mrs. Robinson then said that she didn't want Dr. Buswell for her husband; her husband was not sick, but she wanted to get him to blow his brains out, as he was at her house the night before and insulted her; I once told Mrs. Robinson to go home, that I did not want her there; she said she would not go; this was about three days before she was put in jail; she said she would let me know what authority she had there; I told her again to go, to go out of the house; I said no more on that subject afterwards; she went shortly afterwards; three days after she came in and said she had a warrant for me; that I had slandered her; asked her what I had said about her; she made no reply; came up and kissed me and asked me to forgive her.

*Cross-examined by Mr. Van Santvoord.*—Live on the corner of North First and Rensselaer streets; about four times as far as across the court room from where Mrs. Robinson lived; I was then living with my father; I have one older sister, who is not at home; I was the oldest of the family at that time;

The People *v.* Robinson.

my father is a gardener; he was generally about during day times; I was seventeen years of age the 3d day of last April; my next oldest sister now present was fourteen the 4th of April last; I was not acquainted with Mrs. Robinson until she came to have the dress altered; had seen her before; saw her going into Mrs. Lanagan's; it was March or April; one year ago last March when she came; I fixed the dress for her; she first told me that she cut the dress at first, and then afterwards that a dress maker cut it; I thought it singular at the time that she should tell me two different stories; I do not remember whether I said any thing or not when she told me Mr. Boutwell had slandered her; at this first interview said she went into Mr. Galvin's one day; that there was a man in there who insulted her; she said he was going to lay violent hands upon her; that she drew a revolver and bid him stand; I recollect nothing further of this conversation; after that we became quite intimate; she frightened me; she took hold of me the same as she said she did hold of the man, but she laughed and seemed so pleasant about it that I thought little of it afterwards; when she saw I was frightened she laughed; I was not frightened by her much afterwards. I have seen ladies in liquor; can't say how many; as many as two or three; can't say that Mrs. Robinson was in liquor at this time. I never knew Mrs. R. to drink any thing stronger than peppermint cordial; at any of these interviews I could not say she had or had not been drinking liquor; I think it was after the first conversation, and when she showed me the daguerreotype, that she told me about her father being an Irish lord.

*Anthony Goodspeed* sworn.—I reside in Troy; am a butcher in the Centre Market with Mr. Fonda; should know Mrs. Robinson if I should see her (she uncovered her face); that is the woman; she came to the market the last day of March, 1853, in the afternoon; she wanted to buy some game; she asked me if we had any game, and I told her we hadn't any, that the season of game was about over; she conversed principally about game; she wanted to get some wild meat; I told

her we hadn't got any; she asked me those questions for game
about a dozen times; she was there in the neighborhood of
fifteen minutes, I should suppose; while there she was laugh-
ing, turning round on her heels, and would "ha! ha!" a num-
ber of times; she started to go out of the door, and come back,
when she said she had been down to Robertson's office to take
out a half dozen summonses and warrants to get her neighbors
to the court next morning, and to make an April fool of them;
she made a number of gestures, &c.; she stepped to the stairs,
and asked me would I not tie her gaiter up; I did so; she
turned around then and went towards the door, when I asked
her who she was? and she told me Mrs. Robinson; I think I
have stated all she did; she said there had been people abusing
her at the dam.

*Cross-examined by Mr. Hogeboom.*—Should think she was
not in liquor; her gaiter was loose; she did not tell me who
was abusing her; did'nt give me any names; don't know any
thing about any person being discharged; think it was the
state dam referred to; could not say who had charge of the
state dam.

*Mary Jane Dillon, cross-examined* on the part of the
prosecution by *Mr. Van Santvoord.*—I can tell at what inter-
view Mrs. R. said her father was an Irish lord; it was the same
interview that she showed me the daguerreotype; the daguerreo-
type I saw at the first interview; this was the same inter-
view at which she told me her father was an Irish lord; the
second interview took place the next day after she came to
have the dress fixed; the second time she brought me more
sewing; had a long conversation this time; talked about a
great variety of subjects, but don't recollect what they were;
don't recollect that I told her much about our family; she ap-
peared a pleasant lady to talk with, and I was rather pleased
with her conversation; her manners were agreeable to me; I
am sure she said an Irish lord; my father is an Irishman; I was
born in Vermont; it was before that she told me her father was
an Irish lord, and she had been turned away from the castle
for marrying a poor man, that she showed me the daguerreo-

type; the miniature showed a lady of about thirty years of age; she did not tell when her mother was in France; don't think I believed this story — can't be positive; when she talked about her mother's death she cried violently; believe she cried when she showed me the miniature; she continued crying but a short time; don't recollect what I said to her; she soon commenced conversing about some other subject, and then she commenced laughing; don't recollect what that subject was; I think I laughed too; immediately she commenced dancing, and danced but a short time; I think the subject she talked on was rather amusing; I don't think it was about balls or parties; I did not dance; my sister was not present; I do not think any other person besides myself and Mrs. Robinson was present; her dancing was not regular; she jumped around; it was a figure I never saw danced before; she offered to show me no steps of dancing, or anything of the kind; I think I laughed at the performance; we parted good friends; I think it was at the same interview that she told me her father was a French lord; I don't remember what I said when she told me that; didn't say who the " poor man " was that she married; Mrs. Robinson told me at one time that she was twenty-seven years of age; don't remember at what time she came for her dresses; I think I took them home; this, I think was the first time I was ever in Mrs. Robinson's house; don't remember how long I remained; think I staid there two hours and a half; was in conversation with Mrs. Robinson all that time; the reason I staid so long was that she did not want to have me go; I wanted to go; she did not detain me by force, but by persuasion; I think she told me stories then which I did not believe to be true, but I do not remember them; I think she told the story about being in Mr. Galvin's at that time; her conversation was as pleasant and agreeable as on former occasions, part of the time; part of it was not; every now and then her conversation was not so agreeable; think it was coarse; she used profane language; when I left she asked me to come and see her again; think I told her I would; no person to my knowledge, lived in the house with her at that time; I did go to

see her again; I think it was the next day; she had been to our house before I repeated my visit the second time; our interview at our house was very short; she came over for me to go back with her; I went with her; I staid there all that day; it was somewhere between the hours of eight and ten in the morning that I went; I took dinner with her; did not take tea; think I began to feel on intimate terms with Mrs. R.; this familiarity of intercourse continued for about two weeks afterwards; I visited frequently at her house, and she at ours; almost every day I saw her, but was not at her house every day; there were about four days she was not at our house, and I didn't go to hers; I had a very pleasant visit at her house the day I spent there; it was pleasant, part of the time; her conversation was pleasant, part of the time; there was something in her conversation that made it unpleasant another part of the time; don't remember what it was; it consisted in a peculiarity of language; such language as ladies don't use; it was profane language; she used obscene words; at this time or some other, I think she said something about the man she had married; she said her husband was a contractor on the rail road; his name was Mr. Robinson; do not recollect at which conversation it was she told me she was educated at Mrs. Willard's Seminary; think she told me at one time what her maiden name was, but I do not recollect what she said it was; when she said she was educated at a nunnery, she did not tell me where it was; never heard Mrs. Robinson speak French to any person; she told me she could speak French; Mr. Lanagan's family were Mrs. Robinson's associates; Marietta Curtiss and my sister also associated with Mrs. Robinson; another sister older than the one here yesterday, and older than I; Marietta Curtiss lived a short distance from my father's house; she is a friend of mine; don't know that she ever went to Mrs. Robinson's; Mrs. Robinson used to go to her house; know of her going there only once; I have seen Mrs. Robinson drink strong beer and peppermint cordial; don't know which may be the strongest; have frequently seen her drink strong beer; she drank some at her own house on the day I spent there, I think; won't be posi-

The People *v.* Robinson.

tive; I did, during these interviews, see her on occasions when I thought she was a little worse for strong beer or peppermint cordial; don't recollect that I thought so on the night she came to our house, for my sister to go after Dr. Buswell; I thought she seemed strange that night; I know Dr. Buswell; know Mr. Boutwell by sight; he lives on River street, next opposite to Mrs. Robinson's; I don't know that Mr. Buswell has a dam; know he has a mill; know there is a dam in the river a short distance above Mrs. R.'s house; the mill is on the bank of the river, I think a quarter of a mile from the dam; it is between the dam and Mrs. Robinson's house; it was about a week after that I became acquainted with her that she told me about Boutwell's stopping the navigation; I was standing then on the bank of the river with Mrs. R.; between Mrs. R.'s house and the river, and running down to it is a vacant lot; there is a door leading from Mrs. R.'s yard to this vacant lot; on the bank of the river are some rocks; we went to the bank of the river, because Mrs. R. saw a boat from her window coming down; she said Mr. Boutwell had stopped the navigation, and she didn't believe the boat could pass; Mrs. R. had been observing this boat from her window; the boat was below the dam, coming down the river; it was not a sail; when we first saw the boat I could see it was coming down the river; saw it from Mrs. Robinson's window; she said she didn't believe the boat could pass Mr. Boutwell's mill; I had never heard of Mr. Boutwell's stopping the navigation before Mrs. R. said so; I don't think she told me the story of poisoning the dog with Dr. Buswell's medicine at this time; it might have been the same time or afterwards that she told me about her father sending her $150 to buy a dress to appear in court against Boutwell; it was at this time on the bank of the river that she told me about her swimming; do not know that Mrs. R. can swim; had seen her drink no beer or peppermint cordial that day, that I remember of; it was some weeks after I became acquainted with her that she came to my house with no dress on, think it was in March or April, between four and five o'clock in the morning; do not remember whether it was light; she put the

dress on at our house; think it was daylight when she put it on; she told me she had forgot her dress and didn't want to go back after it; I don't think I heard her speak of David Smith before; she said she was going to get a warrant for David for breaking into her house and stealing her revolver; said nothing about the difficulty she had with him at Lanagan's that time; it was a mousseline de laine dress I let her have; it was neither my best nor poorest dress; it was not my ordinary dress; it was such an one as I sometimes walk in; I received the dress uninjured; when Mrs. R. said it was not her husband she wanted Dr. Buswell to see, but that she wanted Dr. B. to come up there that she might shoot him, she appeared very angry; used very profane language on that occasion; called him bad names; I don't wish to say what the names were; she used obscene language concerning him; I never saw Dr. B. at Mrs. R.'s house; I do not wish to repeat the language she used relating to Buswell, because it was both profane and obscene language; I don't think I kept up my familiarity with her long after this time; I could not tell how long before her arrest it was that we ceased to associate together; I told her once to go home; this was after she came to our house at eleven o'clock at night; the next time she came she said she had come with a warrant for me; that I had been talking about her; there was no quarrel; there was a little dispute; we made it all up again before we parted, and she kissed me; I don't think I ever went to her house after this time; at my various visits to Mrs. R.'s house, I saw Mrs. Lanagan's sister there, who just came to the door and returned again; my father came in there; he was at work in the garden; saw a man there one day; don't know who it was; had a slight glimpse at his face; he was a middle aged man; she told me at one time it was her husband; she told me again that it was another person.

*To Mr. Pierson.*—When Mrs. R. told me that her father was an Irish lord, I don't recollect that I thought she was in liquor.

Further evidence of the singular conduct of the prisoner was

introduced for the purpose of supporting her defence of insanity.

*Mr. Beach* asked the court how it would rule in regard to the use of medical works touching insanity; if citations from those works should form part of the argument?

The court said such was the usual course.

*Mr. Beach* stated that the evidence for the defence had now closed.

Some testimony was then introduced on the part of the prosecution for the purpose of explaining her conduct, by showing that the prisoner had sometimes been " the worse for liquor."

The testimony was here closed.

In the course of his charge to the jury the presiding judge said: It is my duty to say to you, gentlemen, that, if she was intoxicated, even to such an extent that she was unconscious of what she was doing, still the law holds her responsible for her act. It is true to constitute the crime of murder there must be killing of a human being with a premeditated design to effect death. But this design need not be proved. Where the act is committed the law imputes the design. It proceeds upon the simple principle that a man may reasonably be presumed to intend to do what he in fact does. Thus, if a man will draw from his pocket a pistol and deliberately shoot down his fellow man, the law, without further proof, adjudges that it was in his heart to kill him. If he would excuse himself he must show affirmatively that he had no such guilty purpose. Then, and then only, can he be exonerated from guilt. If it appear that by the inscrutable visitation of Providence the faculties of his mind had become so disordered that he was no longer capable of discriminating between right and wrong in respect to the act he has committed, then the law, in its justice, pronounces him innocent of crime. But if his derangement be voluntary — if his madness be self-invited — the law will not hear him when he makes his intoxication his plea to excuse him from punishment.

If, then, the accused mingled poison in the beer that was drank by Lanagan, the law charges her with a design to kill him — and though she may have been excited by drink at the time, even to such an extent as not to know what she was doing, she must answer for the consequences. Her self-inflicted insanity must not be allowed to avail her for her defence. The law still imputes to her a murderous intent. (*a*)

The counsel for the prisoner duly excepted to that part of the charge of the said justice contained in the following words, to wit:

"It is my duty to say to you, gentlemen, that if she was intoxicated to such an extent that she was unconscious of what she was doing still the law holds her responsible for her act."

And also to that part thereof wherein the said justice instructed the jury that " though the prisoner may have been excited by drink at the time of the alleged offence, even to such an extent as not to know what she was doing, she must answer for the consequences; her self-inflicted insanity must not be allowed to avail her for her defence. The law still imputes to her a murderous intent."

The jury found the prisoner guilty of murder.

The counsel for the prisoner thereupon presented and read in evidence to said court the following affidavit and certificate:

*Rensselaer Oyer and Terminer:*

Henrietta Robinson
ads.      } *Rensselaer County, ss:*
The People.

John Price, of the city of Troy, in said county, being duly sworn upon his oath says, that he was duly elected sheriff of said county at the general election in November, 1852; that on the first day of January, 1853, he was duly qualified as such sheriff and that since that time he acted and still acts as such sheriff. That a court of Oyer and Terminer and jail delivery was appointed to be held in and for said county and was

(*a*) This charge is reported at length in 1 Park. Cr. R., 649.

held at the Court House in the city of Troy in and for said county on the third Monday of February, 1854.

And this deponent further says, that from and after the first day of January, 1854, Anson Bingham was the district attorney of said county and has acted and still acts as such district attorney since the date last aforesaid.

And this deponent further says that the said district attorney did not, twenty days before the holding of the said last mentioned court, nor at any time before the commencement thereof, issue or deliver to this deponent as such sheriff, nor did he issue or deliver to the sheriff of said county, such precept as is required by title 4, chap. 1, part 3, sections 37, 38 and 39 of the 2d volume of the Revised Statutes; nor did he issue or deliver to the said sheriff any such precept as is required by the said Revised Statutes.

And this deponent further says he is informed and believes that an indictment for willful murder was preferred and found against the above named defendant at the said last mentioned Oyer and Terminer, on which she was tried during the past week and has been found guilty of such murder. And this deponent further says that no precept whatever was ever issued to him by or on behalf of the said district attorney or by or on behalf of any district attorney whatever directing him to summon any grand or petit jurors to act as such at said Court of Oyer and Terminer so held in and for said county of Rensselaer, in the month of February, 1854, as aforesaid.

JOHN PRICE.

Sworn this 29th day of June, 1854, before me,

WM. H. HEGEMAN, Com. of Deeds, Troy, N. Y.

*Rensselaer Oyer and Terminer:*

The People
vs.
Henrietta Robinson. } *Rensselaer County, ss:*

John Price, of the city of Troy, in said county, being duly sworn, says, that previous to and within twenty days of the commencement of the last February Oyer and Terminer for the

.said county, he, this deponent, communicated to Job Pierson, Esq., then and since counsel for the prisoner in this case: That the district attorney for said county had not issued and delivered to him any precept as this deponent has heretofore deposed in his affidavit heretofore made in this case, and also within the same time all the facts in relation to a want of said precept, heretofore stated in his former affidavit before she was arraigned upon the said indictment.

And he further says that as the said sheriff he caused to be published a proclamation, within two or three days of the usual time, in accordance with the requirements of the Revised Statutes referred to in his former affidavit in the same manner and for the same length of time, except the two or three days aforesaid, as though such precept had been issued and delivered to him.　　　　　　　　　　　　　　　　　JOHN PRICE.

Sworn to before me this 28th day of August, 1854.

　　　　　WM. H. HEGEMAN, Com. of Deeds, Troy, N. Y.

*Rensselaer county, ss:*

I, Ambrose H. Sheldon, clerk of Rensselaer county, do certify that no such precept as is mentioned in the foregoing affidavit has ever been returned to or filed with me as such clerk as aforesaid; and that no precept whatever, issued by any district attorney whatever, requiring the sheriff of Rensselaer county to summon grand or petit jurors at the February Court of Oyer and Terminer for Rensselaer county for 1854 has ever been returned to or filed with this deponent as such clerk as aforesaid.

In witness whereof I have hereunto set my hand and affixed my seal of office this 29th day of May, 1854.

　　　　　A. H. SHELDON, *Clerk of Rens. Co*

Judgment was suspended and a writ of certiorari allowed, by which the cause was brought up for review to this court.

*Job Pierson,* for the prisoner.

I. The judge erred in charging the jury " that if the prisoner was intoxicated even to such an extent that she was uncon-

The People *v.* Robinson.

scious of what she was doing, still the law holds her responsible for the act," because if she were so unconscious, no matter from what cause such unconsciousness arose, the killing can not be said to have been perpetrated from a *premeditated* design to effect the death of the person killed. (2 *R. S.* 3*d ed.* 746, § 5.)

II. The judge erred in charging the jury that " though the prisoner may have been excited by drink at the time of the alleged offence, even to such an extent as not to know what she was doing, she must answer for the consequences; her self-inflicted insanity must not be allowed to avail her for her defence. The law still imputes to her a murderous intent." (1 *Russell on Crimes*, 8; *Barb. Criminal Law*, 268; *Pennsylvania* v. *McCall*, *Addison's Rep.* 257; *Penn. Comm.* v. *Dunlap*, *Lewis' Crim. Law*, 394–405; *Bliss* v. *Conn. and Pass. River Railroad Co.* 24 *Vermont Rep.* 424; *Dean's Medical Jurisprudence*, 587; *Ray's Medical Jurisprudence*, § 329, 330, 331, 332; 3 *Am. Jurist*, 15; *People* v. *Clark*, 3 *Selden*, 392; 11 *Humph. R.* 154; 4 *Humph.* 136; 9 *id.* 663; 1 *Leigh.* 612.)

III. The omission of the district attorney to issue a precept to the sheriff of Rensselaer county twenty days before the oyer was held, requiring him to summon the grand jury, who were drawn, was an omission fatal to the conviction in this case. (2 *R. S.* 3*d ed.* p. 271, 272, § 43, 44, 45.)

1. This precept is recognized as a process. (2 *R. S. same ed.* 535, 536, § 93-95.)

2. It is necessary at common law, and is still held necessary, except where it is abolished by statute. (1 *Chitty's Criminal Law*, 505; *Chase* v. *State*, 1 *Spencer*, 218.)

3. It has been adjudged that the precept must be issued to summon a petit jury, and without such precept, judgment will be arrested. It is difficult to conceive why the omission to issue such process for a grand jury, who find an indictment, is not equally fatal to the conviction. (*The People* v. *McKay*, 18 *John. R.* 212; *Nicholas* v. *State*, 2 *Southard*, 539; *The State* v. *Williams*, 1 *Richardson*, 188; 1 *Spencer*, 218, above; 2 *Speers*, 211.)

4. The Revised Statutes are substantially like the statutes in force at the trial of McKay, so far as they affect this question. (2 *Rev. Laws*, 503, § 13, 24 *to* 30; 1 *id.* 328, § 11, 19; 2 *R. S.* 271, 3d ed. § 43, 44.)

5. It is true the Revised Statutes have abolished the venire process in Courts of Sessions, (2 *R. S.* 3d ed. 810, § 25,) and in civil cases, (*R. S.* 3d ed. 507, § 9,) but the fact that the process is not abolished in courts of Oyer and Terminer, manifests the intention of the legislature to maintain it in full force in regard to the latter courts.

6. In affirmative statutes, such parts of the prior as may be incorporated in the subsequent statute, or are consistent with it, must be considered in force. (3 *Howard U. S. C.* 636.)

7. Every clause and word of a statute shall be presumed to have been intended to have some force. (22 *Pick.* 571.)

If they *may* stand together they *shall.* (4 *Gill and Johnson*, 1; 4 *Black.* 148.)

*H. Hogeboom*, for the people.

I. A *new trial* can not be granted on account of any *evidence* of the want of a *precept* from the district attorney, to summon a grand jury. The case or bill of exceptions for a new trial only brings up the evidence and proceedings *at the trial.* Besides, no objection or exception was taken on this ground.

II. The motion in arrest of judgment, or for a reversal on error, for lack of the *precept*, must fail, unless the precept was necessarily a part of the judgment record. The error, if any, must appear upon the *face* of the record. (*Arch. Cr. Pl.* 178, 31, 6th ed.)

III. Such precept was not necessarily or properly a part of the record. The statute required no return. It was for the information and direction of the sheriff. (2 *R. S.* 206, 207, § 37-39.)

IV. To sustain defendant's position with any degree of even *plausibility*, they are bound to show that the precept was a *venire.* Unless it be a *venire*, it was clearly not a necessary part of the record.

The People *v.* Robinson.

V. The precept was clearly not a venire, for the following among other reasons:

1. The statute does not call it such, ncr invest it with the form, qualities or functions of one.

The *venire* is a common law process directed to the *sheriff*, (or coroner) commanding the summoning of a specified number of persons, (usually twelve) of certain qualifications, to make a jury in a specified cause, to determine the matters in issue therein. Each case had a separate venire. It was to be *returned* to the county clerk, and become a matter of record. The selection of the jurors was left to the sheriff. (3 *Bl. Com.* 352; 1 *Burr. Pr.* 227, 228.)

The inconvenience of this introduced the present mode of drawing juries by particular officers, from a list previously selected and returned by others, to make trial juries in all the cases for a particular court. The list thus drawn is *certified* and delivered to the sheriff and constitutes his authority to summon the individuals named, and upon this list he makes his return. (1 *R. L.* 328, § 11.) The venire was at that time retained as a matter of form, though its office was spent. (1 *R. L.* 326-7, § 7, 9; *see also* 2 *R. S.* 721, 722, 733.) But now, except in justices' courts and certain special proceedings, the venire is no longer in use, and is expressly abolished. (2 *R. S.* 410.)

The case of a *foreign* jury is not an exception. For, though a *venire* is issued (*Yates' Pl.* 64; 1 *Humphrey's Prac.* 236) to the foreign sheriff, his duty is to notify the clerk who draws the jury as in ordinary cases, makes and certifies a list of the drawing, and delivers it to the sheriff, who then summons the jurors not upon the venire, but upon the clerk's list. (2 *R. S.* 410, § 10, 11, 733.)

2. So also was the practice under the Revised Laws of 1813. They provided for a *precept* (1 *R. L.* 340, § 16) to be issued immediately upon the *appointment* of a *circuit court*. Yet it was not a *venire*, for the drawing of jurors by the clerk and summoning of them by the sheriff upon the clerk's list were provided for, much as in the Revised Statutes, and (as expressed

in the section) " without any *venire* previously issued," (1 *R. L.* 328, § 11,) or application from the sheriff for that purpose.

3. The *precept* was to be issued immediately after the *appointment* of every circuit, and *fifteen* days *before* the circuit. The *venire* need not be issued *before* the court, and in such cases should not be.

4. The providing of another process, (the jury list) on which the sheriff was to summon and make *return*, evinces the legislative intent, that the *precept* was not intended to be either in *form* or substance the *venire*. (2 *R. S.* 414, § 29, 30, *as to petit jurors; 2 R. S.* 721-2, § 11, 12, *as to grand jurors.*)

5. The *precept* is not *alluded* to, either in the Revised Laws or Revised Statutes, in the article relative to the summoning of jurors.

6. The obvious intent and office of the *precept* was to notify the sheriff of his duties, and to enable him to make public *proclamation* of the courts.

7. The case of *The People* v. *McKay*, (18 *Johns.* 212,) does not decide this case.

(1.) That related to a *petit* jury and not to a *grand* jury.

(2.) That case was decided under the Revised Laws, by which a *venire* was still necessary. The venire was a matter of *record*, and its absence was a defect apparent on the *record*, and *that* venire having no *seal* was *nugatory*. But that *venire* was a different process from the *precept*. (*See* 1 *R. L.* 340, § 16, *as to precept; 1 R. L.* 326-7, § 7 *and* 9, *as to venire.*)

8. The case of *The People* v. *McGuire*, decided in the fifth district, should not control this case.

(1.) That case related to a *petit* jury and not to a *grand* jury.

(2.) That case was decided *erroneously*, and without due consideration.

(a.) It based the decision on the case of *The People* v. *McKay*, which was a case of the want of a *venire* and not of a *precept*.

(b.) It confounded the palpable distinction between a *venire* and a *precept*, which has been already pointed out.

The People *v.* Robinson.

(c.) It loses sight of *other* differences between the precept and the venire. (e. g.) It is the *return* on the *clerk's list*, which governs the court in imposing penalties on nonattending jurors. (2 R. S. 415, § 32.)

(d.) Again trial jurors are not summoned for the *Oyer and Terminer* but only for the *Circuit;* and the Circuit jurors are declared to be jurors for the Oyer and Terminer. Now the district attorney's *precept*, if it is to be regarded as a *venire*, would command the summoning of jurors for the Oyer and Terminer and for that alone, and this is contrary to the statute just referred to. (*See* 2 R. S. 733, § 2.)

(e.) The court in *The People* v. *McGuire*, expressly refuse to decide the question as applicable to a *grand* jury.

(f.) The objection of the want of a *precept* is in the nature of a *challenge to the array*, and this challenge (to a grand jury) · is abolished by statute, and with it must fall the incidents and elements of this species of challenge. Indeed objections to grand jurors are expressly limited to those stated in the statute, and this is not among them. (2 R. S. 724, § 27, 28.)

9. The omission to name the courts of Oyer and Terminer and Sessions in the statute, (2 R. S. 410, § 9,) which dispenses with the *venire*, was not because it was designed to retain venires for those courts, but because no trial jurors were to be summoned for those courts. They were to be taken from the Circuit and County Court juries. (2 R. S. 733, § 2.)

10. The omission to require a *precept* for Courts of Sessions, affords no inference that it was designed to have the precept operate as a *venire* in the courts of Oyer and Terminer, but the contrary.

Again, by 2 R. Laws, 150, *sec.* 4, in Courts of Sessions, the sheriff summoned a grand jury only by the direction of the justices of that court. Now being obtained in a different way, that provision was abolished, and a *precept* was unnecessary. Hence its abolition by 2 R. S. 724; *See Notes of Revisers*, (3 R. S. 2d ed. 843.)

VI. The statute as to the precept, no doubt, was merely *directory*. It was not *necessary* for the sheriff, nor to give

jurisdiction of parties or subject matter, or jurors. It gave no new or additional power, and imposed no duties that were not otherwise imposed.

VII. It is *too late* to raise the question *after a trial.* It is *waived* by not being taken in time. (1 *Arch. Cr. Pl.* 16 *ed.* 67, 18; *Whar. Cr. Law,* 863; *Com.* v. *Smith,* 9 *Mass.* 107; *Whar. Cr. Law, 3d ed.* 228, 229.)

1. It should have been taken (if at all) by a challenge to the *whole array* of jurors or to them *individually.* Such is the spirit and object of the whole practice in regard to *challenges.* They have no other object. They may as well be dispensed with *altogether,* if they are not applicable in this very case.

2. All challenges to the *array,* and all objections to individual jurors, being taken away, except those expressly reserved by the statute, the objection in question has no longer any foundation, and must be entirely disregarded. (2 *R. S.* 724, § 27, 28.)

3. No such objection can touch the validity of the indictment, *after trial.* The judgment record begins with the *indictment.* If that is not *quashed,* or is not bad *upon its face,* it operates as a solid foundation stone for the judgment. Before trial it may be set aside, but not after. It does not affect the guilt or innocence of the accused. Unless impeached at the proper time, like every other record, it imports absolute verity. (*People* v. *Hulbert,* 4 *Denio,* 133; *People* v. *Griffin,* 2 *Barb.* 427.) So also in regard to a trial jury. (*Dayharsh* v. *Enos,* 1 *Selden,* 531; 2 *R. S.* 733, *sec.* 2; *Code, sec.* 21.)

VIII. The precept is never necessary, except for *special* or *extraordinary* terms of the Oyer and Terminer appointed by the special commission of the governor, or the warrant of a circuit judge.

1. The practice of requiring a precept originated under the Laws of 1813, (1 *R. L.* 339, § 16), and previous statutes of which that was nearly a transcript, when there were no *stated periods* fixed by *statute* for the courts. Hence the requirement of the district attorney's precept to the sheriff as a matter of *precaution* to *ensure* notice of the *time and place* of holding same.

The People *v.* Robinson.

It was no more a *venire* than the *clerk's list* or the *statute* itself, although it directed the summoning of jurors.

2. After the constitution of 1821, the terms of circuits and of Oyer and Terminer were fixed for two years in advance, by appointments of the circuit judges, which were notified as follows:

(1.) By filing same with county clerk.

(2.) By publication in state paper. (2 *R. S.* 201, &c.)

(3.) By notice served by county clerk as sheriff and others of the drawing of jurors, under which they drew and certified, and the sheriff summoned the jurors.

*And no precept was necessary or required.*

3. But there was another court—the Court of "Oyer and Terminer and *jail delivery*," specially commissioned by the *governor*, or for special reasons appointed by the *warrant* of a circuit judge, *and to this the precept applied.*

The governor sent his commission to the secretary of state, and he served a copy upon the *district attorney.* The circuit judge sent his *warrant* to the *district attorney.* And in such cases (and such only) the district attorney issued his precept to the sheriff. (2 *R. S.* 205, § 32, 35, &c.)

4. The "Oyer and Terminer" and "Oyer and Terminer and jail delivery," were different courts, and so recognized by the revised statutes. (*See* 1 *R. L.* 340, § 17; 341, § 23; 1 *Ch. Cr. Law*, 142, 145, *&c. ed. of* 1847; *See* 1 *R. L. note.*)

5. This theory makes the contents of the precept *consistent* and *appropriate.* It requires the summoning of grand *and petit* jurors, this being an *extraordinary* court. But for the ordinary and stated courts of Oyer and Terminer, no *trial* juries were drawn as we have before seen.

6. If the precept applies to the *stated* terms, then the district attorney, must, without delay, issue *precepts* for *each* of the terms embraced in the appointments; and the sheriff must, in like manner, publish his *proclamations* for *each* of said terms, making numerous publications and heavy expenditures. This was not intended.

IX. The provisions of the Revised Statutes in relation to the issuing of precepts, have been repealed by the Code.

1. The precept gave notice to the sheriff of the *time and place* of holding the court. So far, at least, it is expressly repealed by the Code. (*See Code,* § 17.)

2. There is no such court now in existence as the court of " Oyer and Terminer and jail delivery."

3. The court provides for the appointment of courts of Oyer and Terminer, both ordinary and extraordinary, and the mode and manner of making known the time and place of holding the same, and neither in express terms requires nor by reasonable implication renders necessary the precept of the district attorney. It was only necessary in the *extraordinary* court of Oyer and Terminer and *jail delivery*, before mentioned, and that court having expired, with it have also ceased the existence and necessity of the district attorney's precepts. (*Code,* § 17 *to* 25.)

X. The exception to the question put to deceased, how he felt after that glass of beer, was not well taken.

1. The question was of the same character with others which had been previously asked by the prisoner's counsel, or with their acquiescence.

2. It was a part of the res gesta of the transaction that was the subject of inquiry.

3. It tended to show the cause of his death, it was one of the *symptoms* of disease, which must always, more or less, be derived from the statements of the patient.

XI. The exception to the proof offered to show the existence of poison in Miss Lubee's stomach, was not well taken.

1. It was testimony tending directly to show that the deceased came to his death by poison. He and Miss Lubee were together, they both drank of the same cup, at the same time, administered by the same person, on the same occasion.

2. Proof of a similar character had been allowed to be given, without objection, on the part of the prisoner's counsel, and in fact with their concurrence, as to the acts, symptoms, and cause of death of Miss Lubee.

The People *v.* Robinson.

XII. There was no error in the charge of the court on the subject of intoxication. The substance of the charge was that the voluntary intoxication of the prisoner (if it existed) did not excuse her from criminal responsibility for her acts committed in such a state.

1. This is in accordance with all the authorities. (*Coke Litt.* 247; 1 *Russ. on Crimes*, 7, 8; 4 *Black. Com.* 26; *Roscoe's Cr. Ev.* 783; 1 *Arch. Cr. Pl.* (*6th ed.*) 5, 6 *and note* 1; 1 *Hale P. C.* 32; *Barbour's Cr. Treatise*, 267; 2 *Arch. Cr. Pl.* 2062, *note; Whar. Cr. Law*, 13, 14.)

2. By the common law it was necessary in all cases to establish the existence of *malice*, "malice aforethought," in order to constitute murder. It was an essential ingredient of the crime. (*See above cases.*)

3. It is equally clear that by the common law, voluntary intoxication, even when carried to such an extent as to deprive a party temporarily of reason, did not mitigate, but rather aggravated the crime. It was still *murder;* and it was so pronounced, not precisely because it necessarily implied the existence of malice, but principally from motives of public policy, because such a construction was essential to the safety and protection of the citizen. (*United States* v. *Drew*, 5 *Mason*, 28.) *United States* v. *McGluz*, 1 *Curtis*, 1; 1 *Beck's Medical Juris.* 627; *Cornwell* v. *The State*, *Martin & Yerger*, 157; *Swan* v. *The State*, 4 *Humph.* 136.

4. The rule is the same under our Revised Statutes, which pronounce homicide to be murder, "when perpetrated from a premeditated design to effect the death of the person killed or of any (other) human being." (2 *R. S.* 657, § 5.)

(1.) Such was the *intention* of the revisers. The language of *this* section, as reported by them, is precisely like that adopted by the legislature, except the word " other." Their intention was in this particular, in defining the crime, to make " no departure from the present law," by changing the phraseology. (*See Revisers' Notes to this section*, 3 *R. S.*, 2d ed., 808, 809.)

For this definition of murder, (in substance) they expressly refer to 1 *Hale, P. C.* 50.

(2.) The words " premeditated design," have the same meaning as " malice aforethought." (*People* v. *Clark,* 3 *Selden,* 385; *McDaniel* v. *The State,* 8 *S. & M.* 418; *People* v. *White,* 24 *Wend.* 552.)

In this case the court say: " In its definition of murder, our statute (Mississippi) instead of " malice aforethought," uses the words " premeditated design."   In legal effect we regard them as the same.

(3.) The same principles of public policy and legal construction, which before the Revised Statutes made the drunken homicide (though temporarily bereft of reason) sufficiently chargeable with " malice aforethought," to make the killing *murder,* also charge him now with " premeditated design," and a murderous intent.

(4.) If the intoxication of the prisoner exculpates her from the charge of murder, it exempts her from punishment *entirely,* or at most, makes her crime manslaughter in the fourth degree, which may be punished by a merely *nominal* fine or imprisonment in a county jail. (2 *R. S.* 662, 663.)

(5.) The indictment is under the common law form, charging the act to have been done with *malice aforethougkt,* and this is proper. (*People* v. *Enoch,* 13 *Wend.* 159; *People* v. *White,* 22 *Wend.* 176; 24 *id.* 537, 571.)

And the proof required to bring the case within the present statutory definition of the offence is no more than was necessary under the former law. *People* v. *Clark,* 3 *Selden,* 385.)

Hence the old authorities apply.

(6.) The true test of criminal responsibility for murder, (except in cases of fixed or habitual insanity) is to be sought for in the *nature* and *characteristics* of the act of homicide, and the *means* by which it is perpetrated.   If these indicate *malice* and an *intent* to kill, the crime is perfect, without reference to the state of *sobriety* or *intoxication* of the accused party.

(7.) The cases decided under the laws of other states, where different degrees of murder obtain, do not necessarily *conflict* with the views above expressed, and should not *control* this court.

The People *v.* Robinson.

(a.) They *all* class *poisoning* under the head of murder in the first degree without reference to the question of *premeditation* they assume that the act of poisoning necessarily implies *premeditation* and a murderous intent. *Lewis's U. S. Cr. Law*, 348 to 353; *Wharton's Cr. Law; Law of Homicide*, 354 to 356.)

(b.) They merely decide that evidence of the *fact* and *degree* of intoxication is proper for the *consideration* of the jury to enable them to judge of the quality of the act. They do not by any means reduce the act when committed in a state of *gross* and *senseless* intoxication to murder in the second degree. It being necessary under those statutes for the jury to fix the *degree* of murder, for which the accused should be convicted, it is declared to be proper to allow evidence of the intoxication of the prisoner, not to exempt him from criminal responsibility, not even to reduce the crime to manslaughter, but to *aid* in ascertaining the true grade of murder, whether of the first or second degree. (*Swan* v. *The State*, 4 *Humphrey*, 136; *Pirtle* v. *The State*, 8 *id.* 663; *Hall* v. *The State*, 11 *id.* 154.)

5. There is nothing in the facts of the case which called for a charge upon the point of *intoxication*, at least intoxication that deprived the accused *of consciousness or reason*, and consequently, even though the charge were *erroneous* in that particular, it would furnish no cause for setting aside the verdict. (*Shorter* v. *The People*, 2 *Comstock*, 193; *The People* v. *Clark*, 3 *Selden*, 385.)

*By the Court*, PARKER, P. J.—In charging the jury, the learned judge made use of the following expression. " It is my duty to say to you, gentlemen, that if she (the prisoner) was intoxicated to such an extent that she was unconscious of what she was doing, still the law holds her responsible for her act." And afterwards in another portion of the charge, the judge said, " though the prisoner may have been excited by strong drink at the time of the alleged offence, even to such an extent as not to know what she was doing, she must answer for the consequences; her self-inflicted insanity must not be allowed to avail her for her defence. The law still imputes to her a

murderous intent. Exceptions were taken by the prisoner's counsel to each of these parts of the charge, and their alleged erroneousness constitutes the first ground on which they now rely for a reversal of the proceedings of the Oyer and Terminer.

If the proposition, that the law would hold the prisoner responsible for her act though she was intoxicated to such an extent that she was unconscious of what she was doing, stood alone and unexplained by the context, so as to be distinctly presented for adjudication, I should have no hesitation in saying that it could not be sustained, for by conceding the unconsciousness of the prisoner it contains within itself, a relinquishment of the legal presumption, that the prisoner must have intended the natural consequences of her own acts. It would, therefore, condemn the act as the result of premeditated design, when it concedes on its face that none existed. The proposition standing by itself, would apply to a person reduced by intoxication to a state of insensibility; and would impute to him a premeditated design to take life, if he should by chance kill a person by stumbling against him or by rolling against him in a gutter. It would convict of murder a drunken mother, who should smother her infant in her embrace, or by overlying it in bed, however strong might have been her affection for her offspring. It is hardly necessary to say, that no sound legal construction could bring such a transaction within the statute definition of murder, which requires, in all cases like that now before us, a premeditated design to effect death. (2 R. S. 657, § 5.)

But it is apparent that it was not the intention of the judge to lay down any such proposition. The portion of the charge excepted to must be considered with reference to the facts of the case, and in connection with other parts of the charge which are necessary to a proper understanding of its import and meaning. The offence charged was that of murder by administering poison. The defence principally relied upon was insanity. It was not claimed, nor was there any evidence to warrant a claim, that the prisoner was so much intoxicated as to be bereft of her senses or unconscious of what she was

The People *v.* Robinson.

doing. On the contrary, design was apparent throughout the whole transaction. Whether that design was conceived and entertained by a mind sober or excited by strong drink, was not material, and whether by a mind sane or insane, was a proper subject for the consideration of the jury. The whole charge taken together shows, I think, that when the judge said the law would still hold the prisoner responsible for her act, though she was intoxicated to such an extent as to be unconscious of what she was doing, he had reference, not to a state of insensibility, but to a state of excitement or madness, the immediate consequence of indulgence in strong drinks. For, after putting a case by way of illustration, inconsistent with the construction claimed by the prisoner's counsel, and then stating that if it appeared that by the inscrutable visitation of Providence, the faculties of a man had become so disordered that he was no longer capable of discriminating between right and wrong, in respect to the act he had committed, then the law would pronounce him innocent of crime, he added: " But if his derangement be voluntary—if his madness be self-invited —the law will not hear him when he makes his intoxication his plea to excuse him from punishment." The whole of this portion of the charge taken together and the explanation contained in the other part of the charge excepted to, show, very satisfactorily, that the judge intended only to charge, that self-inflicted insanity, the immediate consequence of drink, would constitute no defence; and it could, I think, have been understood by the jury in no other sense.

To that extent, the rule has long been established at common law. (4 *Coke,* 125; 1 *Co. Litt.* 247; 1 *Hale,* 31; 4 *Black. Com.* 26.) " A drunkard " says Lord Coke, " hath no privilege thereby; but what hurt or ill soever he doeth, his drunkenness doth aggravate." (*Coke Litt.* 247.) Russell says, (1 *Russ. on Cr.* 7,) " with respect to a person *non compos mentis* from drunkenness, a species of madness which has been termed *dementia affectata,* it is a settled rule, that if the drunkenness be voluntary, it can not excuse a man from the commission of any crime, but on the contrary must be considered an aggravation

of whatever he does amiss." " *Nam omne crimen ebrietas in-
cendit et detegit* " has become a maxim of the law. (4 *Black.
Com.* 26.) The rule is otherwise when the drunkenness is not
voluntary; as if a person by the unskillfulness of his physician,
or by the contrivance of others, and without any volition on
his own part, eat or drink such a thing as causes frenzy, this puts
him in the same condition as other insane persons, and equally
excuses him. (*Barb. Cr. L.* 268.) And in cases of *delirium
tremens* or *mania a potu,* the insanity excuses the act, the frenzy
being, not the immediate effect of indulgence in strong drink,
but a remote consequence superinduced by antecedent drunken-
ness. (*Barb. Cr. L.* 268; *Dean's Med. Jur.* 587; 3 *Am. Jurist,*
5, 20.) These general principles are fully recognized in the
modern English cases, (*Rex* v. *Patrick,* 7 *Car. & P.* 145; *R.* v.
*Meakin, id.* 297; *Burrow's case,* 1 *Lewin C. C.* 75; *Rennie's case,
id.* 76; *R.* v. *Thomas,* 8 *Car. & P.* 820,) and also in decisions in
this country, (*McDonough's case, Ryon Med. J.* 294; *cases cited
in* 1 *Beck's Med. Jur.* 627; *Bennett* v. *State, Mart. & Yerg.*
133; *Cornwell* v. *State, id.* 147; *Schuller* v. *State,* 14 *Miss.*
502; 6 *Law Rep. n. s.* 563; 1 *Wright's Ohio Rep.* 30; 8 *Iredell,*
330; *Wilson's case and Birdsall's case, reported in Ray's Med.
Jur.* § 405, 406; *Kelley* v. *The State,* 3 *Smedes & Marsh,* 518;
*U. S.* v. *Clarke,* 2 *Cranch C. C. R.* 158; *U. S.* v. *McGhee,* 1
*Curtis C. C. R.* 1; *State* v. *John.* 8 *Ired.* 330; *U. S.* v. *Drew,*
5 *Mason,* 28.) In the latter case, Mr. Justice Story reiterates
and approves all the rules above quoted. At common law,
therefore, there can be no doubt of the correctness of the charge
on this point.

But it is supposed our statute has so far changed the common
law definition of murder as to be inconsistent with the propo-
sition that drunkenness does not excuse but aggravates the
crime.

In those states in which murder has been divided by statute
into degrees, it has been held, that if the accused was intoxi-
cated to such an extent as to deprive him of the power to form
a design, the offence would be no more than murder in the
second degree. In Pennsylvania, murder in the first degree is

The People *v.* Robinson.

where the offence is perpetrated by means of poison, or by lying in wait, or in perpetrating or attempting to perpetrate any arson, rape, robbery or burglary, or by any other willful, deliberate and premeditated killing, and is punishable with death. Murder in the second degree, in that state, embraces " all other kinds of murder," and is punishable by solitary confinement, at labor in the penitentiary. (*Penn. Stat.* 1794.) In that state, it was held in the case of Haggerty, tried at the Lancaster Oyer and Terminer in 1847, that the prisoner could not be convicted in the first degree, if deprived by voluntary intoxication, of the power to form a deliberate design to perpetrate the act. The very able charge of the learned President Judge in that case will be found reported at length in *Lewis's U. S. Cr. Law,* 402. A similar opinion was expressed by Mr. Justice Daniel in the *Commonwealth* v. *Jones,* (1 *Leigh,* 612,) the statute of Virginia, on the subject of murder, being substantially like that of Pennsylvania. (*Virginia Stat.* 1796.) In Tennessee also, where a like division of murder into degrees is made by statute, it was held in *Haile* v. *The State,* (11 *Humph.* 154,) that in all cases where the question is between murder in the first degree and murder in the second degree, the fact of drunkenness may be proved, to shed light upon the state of mind of the defendant, so as to enable the jury to determine whether the killing sprung from a premeditated purpose, or from passion excited by inadequate provocation; and the degree of drunkenness need not be such that it deprives the defendant of the capacity to form a deliberate and premeditated design to take life. All these cases proceed upon the principle expressly declared by Judge Reese in *Swan* v. *The State,* (4 *Humph.* 136,) that although drunkenness, in point of law, constitutes no excuse or justification for crime, still when the nature and essence of a crime are made to depend upon the peculiar state and condition of the criminal's mind at the time, and with reference to the act done, drunkenness may be a proper subject for the consideration of the jury.

All these decisions to which I have referred, as being made

VOL. II.                    39

in states where, by statute, murder is divided into degrees, were made in cases where death was caused by violence and where it became necessary to ascertain whether the act was deliberate and premeditated, so as to fall within the first degree. I am by no means prepared to hold that it might not be proper under our own statute to show the degree of drunkenness of the accused, for the purpose of ascertaining whether he had the power to premeditate the act, though, in the case of Haggerty above cited, Lewis, J., expresses the opinion that it is only in those states where murder is divided into degrees that drunkenness can be set up as a defence. (*Lewis' Cr. L.* 405.) Our statute has not divided the crime of murder into degrees, but it has limited and defined the offence; and a case can not be brought within the first subdivision of the section unless there be a premeditated design, in fact, to effect the death of the person killed or of some human being. The proposition laid down in *Swan* v. *The State,* seems to me to be incontrovertible and to be universally applicable, viz: that where the nature and essence of the crime are made by law to depend upon the peculiar state and condition of the criminal's mind at the time with reference to the act done, drunkenness may be a proper subject for the consideration of the jury, not to excuse or mitigate the offence but to show that it was not committed. There are many cases recognizing this distinction. (*Rex* v. *Grindley,* 1 *Russ. on Cr.* 7, *subsequently questioned in Rex* v. *Carrol,* 7 *Car. & P.* 145; *Regina* v. *Moore, cited* 6 *Law Rep. N. S.* 561; *Marshall's case,* 1 *Lewin C. C.* 76; *Regina* v. *Cruse,* 8 *Car. & P.* 541; *Pigman* v. *The State,* 14 *Ohio,* 555; *Rex* v. *Thomas,* 7 *Car. & P.* 817; *Rex* v. *Meakin, ib.* 297; *Pirtle* v. *The State,* 9 *Humph.* 663; *Add. Rep.* 257; *Wharton's Law of Homicide,* 369; *Wharton's Cr. L.* 92.

But it is only in cases where death is caused by personal violence that it becomes necessary even in those states where murder is divided into degrees to inquire whether the act was deliberate and premeditated, for the purpose of ascertaining the degree. For in all these states " poisoning " is specially placed under the head of murder in the first degree. Even in

The People *v.* Robinson.

Pennsylvania, Virginia and Tennessee, the defence of drunkenness could not, if proved, reduce the offence to murder in the second degree. The very term " poisoning " implies design and could not be criminally committed by a person in such a state of mind as to preclude premeditation. No case could possibly occur in which the act could be perpetrated by a person in a state of insensibility from intoxication; and the degree of drunkenness, if less than that, would not be a material subject for inquiry, for if there were enough mind left to conceive and perpetrate the act, there would be enough to subject the offender to legal responsibility.

· If, in the case before us, the prisoner mingled arsenic with the drink of Lanagan for the purpose of effecting his death, or the death of any other person, she was guilty of murder, though excited, no matter to what degree, by intoxication at the time. There was no pretence that the mingling of the poison was the result of accident, but the most satisfactory evidence to the contrary. A person, stimulated even to the highest pitch of frenzy by strong drink, may still be capable of planning and executing a criminal design, and in such case, it is quite clear, that neither under our statute, any more than at common law, can drunkenness be alleged as an excuse for the act.

If I am right therefore in the construction I have put upon the language of the charge, no error was committed.

If I am wrong in that construction, and, if the abstract proposition excepted to can not properly be considered as modified and explained by other parts of the charge, still it seems to me the exception taken is not available under the decision of the Court of Appeals in the case of *Shorter* v. *The People*, (2 *Comst.* 173.) The proposition excepted to standing alone and as interpreted by the prisoner's counsel had no applicability whatever to the case, and could have no influence on the minds of the jury. There was not a fact or circumstance in the case to warrant an inference that the accused was in a state of unconsciousness or insensibility from intoxication. No case was presented calling for any expression of opinion on

such a state of mind. If therefore the charge was erroneous in that respect, under the authority last cited, it would not furnish a legal ground for awarding a new trial.

It is secondly alleged for error, by the counsel for the prisoner, that the omission of the district attorney to issue a precept to the sheriff of Rensselaer county, twenty days before the Court of Oyer and Terminer was held, requiring him, among other things, to summon a grand jury, was an omission fatal to the conviction in this case. This objection applies only to the grand jury, and not to the petit jury, before whom the issue was tried at a subsequent court. It is not claimed that there was any irregularity in drawing or summoning the grand jury. There has been no omission at all affecting the substantial rights of the prisoner. Every thing was done by the sheriff which he would have done if a precept had been issued and as he would have done it. At most, therefore, the objection is merely technical and was not made in form until since conviction.

In the view that I take of this objection, I do not propose to examine or decide whether the requirement of the statute (2 *R. S.* 206, § 37) is applicable to the stated courts of Oyer and Terminer or only to extraordinary courts of Oyer and Terminer and jail delivery, specially appointed: nor whether, if applicable to the former, it is intended to take the place of the *venire*, with all the incidents belonging to that process at common law, or is merely directory; nor the other questions which were so fully and ably discussed by counsel on the argument and which would properly have arisen before the court of Oyer and Terminer on a plea in abatement or a motion to quash the indictment for the alleged defect. Independent of these questions, it seems to me to be an obvious and conclusive answer to the supposed error that it is too late now to make the objection. The most that can be claimed for the alleged defect is, that it was an irregularity in the proceeding to organize the grand jury in no respect bringing in question the qualifications of the grand jurors or their fairness towards the accused. No injustice has been done to the prisoner. And

The People v. Robinson.

now, after pleading to the merits, and after trial and conviction, this mere irregularity is for the first time suggested.

No adjudged case has been brought to our notice in which it has been held that the want of a precept as to the grand jury was available after verdict. In the *People* v. *McGuire,* (a) recently decided in the fifth judicial district, such an opinion was expressed by Pratt, J., but the decision of the court in that case, as well as in the *People* v. *McKay,* (18 *John R.* 212,) was put solely upon the ground that the petit jury by which the cause was tried was summoned without a *precept* or *venire.* In the *State* v. *Nichols,* (2 *Southard Rep.* 539,) the question arose on a motion to quash the indictment, and the defendant was permitted to withdraw his plea of not guilty, to enable him to make the motion. So, too, in the *State* v. *Chase,* (1 *Spencer R.* 218,) the question was presented on a motion to quash the indictment. In both these cases the indictment was quashed on the ground that the grand jury was summoned by the sheriff without process. In the *State* v. *Williams,* (1 *Rich. Rep.* 188,) and the *State* v. *Dozier,* (2 *Speers R.* 211,) motions were made in arrest of judgment, on the ground that both the grand and petit juries were summoned by writs of *venire* without seals. According to all the authorities cited on this point, it was a sufficient reason for arresting the judgments in those cases that there was no valid *venire* for the petit jury, and the motions would have been granted without reference to the grand jury. When the indictment is sufficient on its face, there seems to me good reason for not going back of the petit jury and the trial, in inquiring, after conviction, into the regularity of the proceedings. There is here no question of jurisdiction. The court had jurisdiction both of the person and of the subject matter.

The statute has limited the grounds of challenge to individual grand jurors and required such challenges to be made before the jurors are sworn, (2 *R. S.* 724, § 27,) and (*id.* § 28) it has abolished challenges of grand jurors to the array. Judge Nelson is said to have held in the Circuit Court of the U. S. in the

(a) Vide *supra* page 148.

"*Jerry rescue*" cases, that by taking away the right to challenge grand jurors to the array, the statute had, by implication, taken away the right to raise the objection in any form. But, in the case of the *People* v. *McGuire,* Mr. Justice Pratt expresses his dissent from such a conclusion. At the least, I think it is fair to say that the statute seems to discourage objections to the grand jury, who can do no more than make the accusation.

We are not without authority for holding that it is too late to raise a question of this character, for the first time, after conviction.

In the *People* v. *Griffin,* ( 2 *Barb. S. C. R.* 427,) after the petit jury had been impanneled and the case on the part of the people had been gone through with, the defendant sought to avail himself of the objections, that the presiding judge was not present when the clerk administered the oath to the grand jury who found the bill of indictment, and that the required oath was not administered at all to some of the grand jurors: but the Supreme Court said " the objection was clearly too late, and it would have been unprecedented to allow this collateral issue to be raised at so late a period."

In *Wa-Kon-chaw-neck-Kaw* v. *The United States,* (1 *Morris Iowa Rep.* 332,) one of the grounds of error was that the record did not show that the indictment was endorsed by the foreman of the grand jury as " a true bill; " and it was held, that the endorsement required by statute was merely directory, and that if there was other proof on the record that the grand jury returned the bill, it was sufficient. That the object of the bill of indictment was merely to put the party accused upon his trial, and that after a defendant had so far admitted the sufficiency of the indictment as to consent to go to trial, especially after the unanimous verdict of the petit jury, it was too late to question the irregularity of the proceedings by which he was put on trial. In that case the court refused to follow the decision in *Webster's case* (5 *Greenleaf,* 432,) where a similar omission was held fatal on motion in arrest, the court in Maine having treated it as a defective indictment.

The People *v.* Robinson.

In the *State* v. *Underwood,* (5 *Iredell, R.* 96) and *State* v. *Duncan,* (*ib.* 98,) a new trial was moved for, on the ground that the grand jury had been drawn by a boy of thirteen years of age, in violation of the statute, and that such illegal drawing might have affected the composition of the petit jury, and it was decided that the objection, if a valid one at any time, came too late, and that it should have been made before the petit jury was sworn, in the form of a challenge to the array.

And it seems to be well settled in most of the states that an objection to the qualification of grand jurors, or to the mode of summoning or impanneling them, must be made by a motion to quash or by a plea in abatement, before pleading in bar. (*State* v. *Martin,* 2 *Iredell,* 101; *State* v. *Lamon,* 3 *Hawks,* 175; *State* v. *Herndon,* 5 *Blackf.* 75; *Vattell* v. *State,* 4 *ib.* 72; *State* v. *Freeman,* 6 *ib.* 248; *State* v. *Seaborn,* 4 *Dev.* 305. On this subject see also, *Wharton's Cr. L. 3d ed.* 226, 229, 975; *Arch. Cr. Pl.* 67; 9 *Mass.* 107; *Com.* v. *Chauncey,* 2 *Ashmead,* 90.) By our statute (2 *R. S.* 728,) no trial, judgment or proceeding on an indictment can be affected by reason of any defect or impefection in matters of form which shall not tend to the prejudice of the defendant.

Having came to the conclusions above expressed, this case presents no point in our judgment, which would require, or authorize this court to grant a new trial. It may be, as is claimed by the defence, that the evidence of insanity strengthened by the absence of any apparent motive for the act called for a different verdict, but if the jury erred on that question of fact, this court has no power to correct the error. The only remedy for such a mistake lies with the Oyer and Terminer, on a motion for a new trial, (1 *Park. C. R.* 625,) or with the executive, on an application for pardon.

Proceedings of the Oyer and Terminer affirmed and order made that the indictment, bill of exceptions, and all the proceedings be remitted to the court below, to the end that judgment might be rendered on the verdict. (2 *R. S.* 741, §24; 11 *Wend. R.* 568.)